GRIFFIS, J.,
for the Court.
¶ 1. The estate of Grace Fairchild, represented by executor Perry M. Fairchild, contested two warranty deeds to Tommy Van Cleave and Marie F. White. Van Cleave and Marie counterclaimed for a constructive trust on a $60,000 transfer to Perry. The chancellor held the deed to Van Cleave was void because of Marie’s undue influence. The chancellor held the transfers to Marie and Perry were valid. Van Cleave and Marie appeal and argue (1) the chancellor erred in using Marie’s conduct to invalidate Van Cleave’s deed, (2) Marie did not exert undue influence on Grace, and (3) there was a confidential relationship between Perry and Grace. We find no error and affirm.
FACTS
¶ 2. James and Grace Fairchild were married with three children: Marie, Ed, *1050 and Perry. James and Grace owned two pieces of real property, their 2.7 acre homestead at 9331 Whippoorwill Road, Meridian, and a sixty acre tract in Lost Gap, Lauderdale County. The Lost Gap property was Fairchild family land, which James had inherited. It was once part of a 240 acre tract, which was divided into four sixty acre tracts.
¶ 3. James died testate on September 19, 1993. Although his will was never probated, the children recognized that his will left everything to Grace. In January of 1993, James gave $60,000 to Perry. This money was part of an inheritance James had received that day of over $72,000, which came from the sale of another sixty acre tract of Lost Gap land. James’s sister, Dorothy McFarland and, Marie’s daughter, Karen Royal testified that this money was given to Perry in trust to take care of Grace. Grace was a long time sufferer of lung ailments, eventually developing chronic obstructive pulmonary disease (“COPD”). Perry testified that the money was a gift.
¶4. In 1996, Grace executed her will. She named Marie as the executrix and Perry as the alternate executor. In the will, Grace left the homestead, along with all furniture, appliances, household goods, and residual personal property to Marie. She left the Lost Gap property and her car to Perry. She bequeathed her porcelain bird collection to Royal. As for Ed, she wrote, “I am not overlooking him in this will as I am providing for him by other means.” Grace made gifts of money to Ed during her lifetime.
¶ 5. Perry lived next door to Grace and helped care for her until December of 1996, when he moved out of state. Marie moved into a trailer on the homestead property in 1988. Eventually Van Cleave, Marie’s live-in boyfriend of sixteen years, moved into the trailer. Marie took care of Grace after Perry moved away. As a registered nurse, Marie had to work away from home three to four nights a week.
¶ 6. In April, 2001, Grace sold the Lost Gap property to Van Cleave for $5,000. At the time, the land was worth $70,400. Marie set up the entire deal within a twenty-four hour period and brought her mother to Van Cleave’s attorney rather than to Grace’s long time estate attorney. Marie was present the entire time, and no one mentioned the purchase price to Van Cleave’s attorney.
¶ 7. In July, 2001, Grace transferred the homestead property to Marie, with a reservation of a life estate for herself. The purpose was to avoid estate taxes. This time, Grace’s estate attorney handled the transfer. Although Marie drove her mother to Grace’s attorney’s office, Marie was not present in the room while Grace consulted with him.
¶ 8. Besides Marie and Grace, no one in the Fairchild family knew of the two property transfers. In fact, as late as September 2003, Grace told Perry that the Lost Gap property was still coming to him through her will. It was not until after Grace’s death on November 20, 2003, that Perry and the other family members found out about the transfers. When asked, both Marie and Van Cleave refused to reveal the purchase price of the Lost Gap property. Marie refused to give the Lost Gap property to Perry, but offered to sell it to him for $1,000 an acre.
¶ 9. On December 5, 2003, Perry brought this action to void the two land transfers as product of Marie’s, Van Cleave’s, or both’s undue influence. Later, Perry was allowed to substitute Grace’s estate as the party plaintiff. Marie and Van Cleave counterclaimed to place a constructive trust on the 1993 $60,000 transfer to Perry.
*1051 ¶ 10. Trial was held July 25-27, 2005. The chancellor found that at the time of the 2001 land transfers, Marie was in a confidential relationship with Grace. Marie was Grace’s primary caretaker. Grace was often depressed and physically weak. He also found that Marie was a beneficiary of the Lost Gap transfer. With regard to the Lost Gap property, he held that neither Van Cleave nor Marie were able to overcome the presumption of undue influence. The purchase price was less than one-tenth the value of the land, Marie and Van Cleave set up the entire arrangement, both kept the transfer a secret for over two years, and Grace later told Perry that he was still inheriting the Lost Gap property through her will. As for the homestead property, Grace was represented by counsel, and Grace and her attorney handled the transfer. Also the effect of the transfer closely resembled the effect of Grace’s 1996 will.[1] Finally, the chancellor found that at the time of the 1993 cash transfer, Perry was not in a confidential relationship with Grace, because her health and mental spirits were much better then, and she was surrounded by other family as well (James and Marie). Therefore, the chancellor refused to impose the constructive trust on Perry’s transfer.
¶ 11. Van Cleave and Marie appeal and argue Marie did not exert any undue influence, and even if she did, it is irrelevant to the Van Cleave/Lost Gap deed. Finally, they argue that Perry was in a confidential relationship with Grace, and a constructive trust should be placed upon the $60,000 he received from James.
STANDARD OF REVIEW
¶ 12. Undue influence is a question of fact. Watkins v. Watkins, 142 Miss. 210, 229, 106 So. 753, 755 (1926). A chancellor’s findings of fact will not be disturbed unless manifestly wrong or clearly erroneous. Sanderson v. Sanderson, 824 So.2d 623, 625(¶8) (Miss.2002). This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied. Id. at 625-26(¶ 8). “The determination of the existence of a constructive trust is a matter of law and thus, subject to de novo review.” Allred v. Fairchild, 785 So.2d 1064, 1068(¶ 7) (Miss.2001).
ANALYSIS

I. Did the chancellor err in using Marie’s conduct to evaluate Van Cleave’s deed?

¶ 13. Van Cleave argues that the chancellor cannot bootstrap Marie’s undue influence onto Van Cleave’s deed. Perry counters that Van Cleave’s deed was actually for Marie’s benefit, and that Van Cleave was merely a strawman.
¶ 14. A party claiming an inter vivos transfer is void because of undue influence must show by clear and convincing evidence that a confidential relationship existed between the grantor and grantee/beneficiary. Estate of Hawkins, 737 So.2d 432, 434(¶ 9) (Miss.Ct.App.1999). When such a relationship exists, the presumption of undue influence arises automatically. Lancaster v. Boyd, 803 So.2d 1285, 1289(¶ 9) (Miss.Ct.App.2002); Hawkins, 737 So .2d at 434(¶ 9).
¶ 15. Although Van Cleave’s name appears on the deed, there was substantial *1052 credible evidence that Marie was the actual beneficiary, if not a co-beneficiary. This is the implied finding of the chancellor. Indeed, the chancellor found that Van Cleave and Marie consider themselves married and “they ‘share most everything.’ ” For example, in a taped conversation between Marie and Perry about the Lost Gap property, Marie states, “I bought that property.” Later in the same conversation, she affirms, “We [she and Van Cleave] bought that property.” Marie and Van Cleave testified they consider themselves married, and they consider that they jointly own each other’s property. To Van Cleave, this includes the Lost Gap property. Van Cleave testified that it was Marie who suggested to both he and Grace that he buy the Lost Gap property. He also testified that Marie was the one who negotiated the deal. After Perry found out about the transfer, it was Marie who offered to sell him the property for $1,000 an acre. Therefore, contrary to Van Cleave’s assertion, the issue of Marie’s undue influence was relevant to his deed. See Estate of McRae, 522 So.2d 731, 740 (Miss.1988) (holding deeds to dominant party’s children void where dominant party was the actual beneficiary). This issue has no merit.

II. Did Marie exert undue influence to obtain the Van Cleave deed?

¶ 16. Having established that her conduct was relevant, we examine Van Cleave’s alternative argument that Marie did not exert any undue influence. Perry argues that the chancellor had substantial evidence to find that she did.
¶ 17. A confidential relationship is defined by the supreme court:
Whenever there is a relation between two people in which one person is in a position to exercise a dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of the mind or body, or through trust, the law does not hesitate to characterize such relationship as fiduciary in character.
Madden v. Rhodes, 626 So.2d 608, 617 (Miss.1993). The relationship “must reflect ‘a dominant, overmastering influence [which] controls over a dependent person or trust justifiably reposed.’ ” Taylor v. Welch, 609 So.2d 1225, 1231-32 (Miss.1992) (quoting Mullins v. Ratcliff, 515 So.2d 1183, 1191-92 (Miss.1987)). “A deed from a parent to a child alone of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party.” Thomas v. Jolly, 251 Miss. 448, 454-55, 170 So.2d 16, 19 (1964). Factors to be considered in determining the existence of a confidential relationship are: (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has her medical care provided by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another. In re Estate of Sandlin, 790 So.2d 850, 853(¶ 7) (Miss.Ct.App.2001).
¶ 18. There was evidence that Grace needed to be taken care of by others. She had psoriasis on her fingers which made it difficult for her to open her medicine bottles. Marie had to do this for her. Grace had COPD, which made her winded easily and less able to take care of her housekeeping. On some occasions, it made it difficult for her to go outside, which would require someone to run errands for her. All agreed that Marie had a close mother/daughter/friend relationship with Grace. *1053 Grace’s transportation to a large extent was provided by Marie. Marie oversaw Grace’s medication and breathing treatments. While they did not have joint accounts, Marie was a signatory on Grace’s account. Several checks were written out of Grace’s account to Marie or Marie’s children. Marie testified these were loans. At the time of the deed to Van Cleave, Grace was seventy-seven, physically weak, and in poor health. Grace had given Marie her power of attorney, although Marie never exercised it.
¶ 19. Further, there was evidence that Grace was worried about her finances and wanted to be secure. There was evidence that she confided this to Marie as the reason she wanted to sell the Lost Gap property, and that she trusted and accepted Marie’s advice that $5,000 was a good price to sell sixty acres of timber land.
¶ 20. There was substantial credible evidence that Marie was in a position to exercise dominant control over Grace, who was both physically dependent upon and reposed trust in Marie. This evidence raised a rebuttable presumption of undue influence.
¶ 21. Once the presumption is established, the burden shifts to the fiduciary to rebut the presumption by clear and convincing evidence. Hawkins, 737 So.2d at 434(¶ 9). In order to overcome the presumption, Marie must show (1) that she exhibited good faith in the fiduciary relationship with Grace; (2) Grace acted with knowledge and deliberation when she executed the deed, and (3) Grace exhibited independent consent and action. Lancaster, 803 So.2d at 1289(¶ 10).
¶ 22. First, we consider whether there was substantial credible evidence that Marie acted in good faith. To determine this element, we must examine five factors: (1) who sought the preparation of the deed, (2) where and in whose presence was the deed executed, (3) what was the fee that was paid to execute the deed, (4) who paid the fee, and (5) was the deed executed openly or secretly. Rogers v. Pleasant, 729 So.2d 192, 194 (¶¶ 8-11) (Miss.1998).
¶23. Royal testified that Grace had offered earlier to sell Royal the land for $2,500, but she declined, because she did not have the money. Marie testified that Grace told her she wanted to sell the land on April 1, 2001. It was Marie who set up the negotiation between Van Cleave and Grace, who called Van Cleave’s attorney to get the deed drafted, and who set up the appointment for April 2 to have the deed executed. Grace executed the deed in the presence of Van Cleave’s attorney and Marie. The fee of $49 was paid by Van Cleave’s account. The check on Van Cleave’s account was written by Marie, including the purported signature of “Tommy Van Cleave.” There was evidence that suggested that, like other things, Van Cleave and Marie considered their separate accounts as shared property. The deed was executed secretly as no one in the family knew anything of this transaction from the date it was signed, April 2, 2001, to the time of Grace’s death in November of 2003. There was substantial credible evidence that Marie acted in bad faith.
¶ 24. Next, we look at whether Grace acted with knowledge and deliberation when the deed was executed. We must consider four factors: (1) Grace’s awareness of her asset and its general value, (2) an understanding by Grace of the persons who would be the natural inheritors of her bounty under the laws of intestacy or under a prior will and how the proposed change would legally affect the prior will or natural distribution, (3) whether non-relative beneficiaries would be excluded or *1054 included, and (4) knowledge of who controls Grace’s finances and business and by what method, and if controlled by another, how dependent was Grace on her and how susceptible to her influepce. Id. at 194(¶ 13).
¶ 25. The evidence was undisputed that Grace had no idea what the Lost Gap property was worth. She considered it basically worthless, when in fact it was worth over seventy thousand dollars. The testimony was that Grace understood that Marie, Perry and Ed were her natural beneficiaries, whereas only Marie and Perry were legatees under her will. The evidence further showed Grace was aware in 2001 that her 1996 will had left Marie the house and left Perry the Lost Gap property. There was evidence that she was unaware that the sale would disinherit Perry out of the property. Specifically, Perry testified that as late as September 2003, Grace told him he was inheriting the Lost Gap property. There was evidence that Marie and her daughter Royal handled Grace’s finances. Royal balanced Grace’s accounts and kept ledgers of income and expenses, while Marie wrote checks out of Grace’s accounts to pay Grace’s bills. There was evidence that Grace was susceptible to Marie’s influence as she accepted without question Marie’s representation of the land’s worth and that the family land be deeded in Van Cleave’s name rather than a family member’s. Even though Grace felt financially insecure, she made multiple loans to Marie and all of Marie’s children. There was substantial credible evidence that Grace did not act with knowledge and deliberation over the sale.
¶ 26. The final element we must examine is whether Grace exhibited independent consent and action. Grace accepted Marie’s word about the sale, rather than consult with her long-time estate attorney Charlie Smith. She did not communicate with the attorney who drew up the deed about the property description or the sales price. In fact, no one mentioned the price to the attorney at all. Grace did not set up the appointment. She was never left alone with the attorney to discuss the deed. While there is evidence that she wanted to sell the property, the whole thing was orchestrated in a twenty-four hour period, without Grace having participated in one step of the planning. There was substantial credible evidence that Grace did not exhibit independent consent and action.
¶ 27. In sum, we affirm the chancellor’s finding that Marie exercised undue influence over Grace with regard to the Lost Gap property.

III. Was there was a confidential relationship between Perry and Grace sufficient to impose a constructive trust on the $60,000?

¶ 28. Marie contends that the chancellor erred in failing to place a constructive trust on the $60,000 transferred from James to Perry. She maintains the money was given to Perry for the purpose of caring for Grace. Perry maintains the transfer was a gift. In the alternative, Perry argues that the claim is subject to several affirmative defenses.
¶ 29. Constructive trust is a means by which one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs. In re Estate of Horrigan, 757 So.2d 165, 170(¶25) (Miss.1999). “Such a trust arises by implication from the relationship and conduct of the parties and may be established by parol testimony notwithstanding the statute of frauds.” Id. “It is the relationship plus the abuse of confidence that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been
*1055 abused.” Thornhill v. Thornhill, 905 So.2d 747, 753(¶ 18) (Miss.Ct.App.2004) (quoting Davidson v. Davidson, 667 So.2d 616, 620 (Miss.1995)). A constructive trust:
arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy.
Sojourner v. Sojourner, 247 Miss. 342, 353, 153 So.2d 803, 807 (Miss.1963) (quoting 54 Am.Jur. Trusts, § 218). “An abuse of confidence within the rule may be an abuse of either a technical fiduciary relationship or of an informal relationship where one person trusts in and relies upon another, whether the relation is a moral, social, domestic, or merely personal one.” Id. at 354, 153 So.2d at 807-08. “A confidential relationship within the rule need involve neither a promise for the benefit of another nor an express fiduciary relationship.” Id., 153 So.2d at 808.
¶ 30. Marie first insists that a confidential relationship existed between Perry and Grace at the time of the 1993 cash transfer, because he testified he performed the same services for his mother in 1993 that Marie did in 2001. However, at this time, Marie also lived right next door to Grace. Perry was never granted power of attorney, nor given joint financial responsibilities over Grace as was Marie. Finally, Grace’s problem with her hands did not start until 1998, and her health was not as bad in 1993 as it was in 2001.
¶ 31. The question boils down to whether he was given the money as a gift or was given the money to care for his mother. If he was given the money to care for his mother, this would place him in a position of confidence and trust over Grace. It would then follow that he abused this confidence, because it is undisputed that he did not use the $60,000 to care for her.
¶ 32. The evidence is in conflict on this point. Only Perry and James were present when the transfer was made in January 1993. Perry testified it was a gift, to take care of his own wife and children and to pay for his house. Over the years, there was evidence of tens of thousands of dollars given by the parents to Marie and Ed. McFarland testified that Grace said the money was for her. When McFarland told Grace to ask for it back, she refused. It was not until six weeks after James’s death that Grace discussed getting the money back. Royal testified that James later told her he gave the money to Perry to hold for Grace. McFarland, however, testified that the last three or four months of James’s life (June to September), he was forgetful and had a difficult time communicating. It was during this time that Royal claims James made the statement to her.
¶ 33. We find that Perry did not obtain the money through an abuse of confidence. Therefore, we hold that he does not hold the $60,000 in constructive trust for Grace’s estate.
¶ 34. THE JUDGMENT OF THE CHANCERY COURT OF LAUDER-DALE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, BARNES, ISHEE AND ROBERTS, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.

. In fact, voiding this transfer would only put the homestead into the estate and then back to Marie through the will.