GRIFFIS, P.J.,
 

 for the Court:
 

 ¶ 1. This case concerns ownership of certain real property and various certificates of deposit. Laura M. Yarbrough filed suit against her daughter, Ann Morrison Patrick, in the Hinds County Chancery Court. Laura alleged that Ann had obtained title to the assets by abuse of a confidential relationship or other wrongful means.
 
 *867
 
 Ann claimed that Laura had given her the assets as gifts. Following a trial, the chancellor entered a judgment in favor of Ann. On appeal, Laura argues that: (1) the chancellor erred when he found that Laura had failed to establish a confidential relationship between herself and Ann; (2) Ann failed to establish the elements of an inter vivos gift; and (3) equity should impose a constructive trust on the assets. We find no error and affirm.
 

 FACTS
 

 ¶ 2. Laura was born on August 24, 1920. She was an eighty-nine-year-old widow at the time of trial. She had four children— Ann, Keith Morrison, Alethia Davis, and Talmadge Morrison. Keith lived next door to Laura. Alethia is a paranoid schizophrenic who lived in the house with Laura. The record is silent on Talmadge. Ann was married and lived apart from the family, although she visited frequently.
 

 ¶ 3. The evidence established that Laura owned a parcel of real property in Hinds County, Mississippi, and two parcels in Jackson County, Mississippi. The record contains two quitclaim deeds, both dated January 6, 2003, which purport to convey these properties from Laura to Ann.
 

 ¶ 4. In her testimony at trial, Laura denied signing these deeds and claimed her signature had been forged. Laura did not allege this forgery in her complaint. In fact, the complaint specifically stated that Laura “did execute such documents necessary to transfer” the properties to Ann. Ann testified that she and Laura went to Ann’s lawyer’s office where Laura signed the deeds. Ann claimed that Laura gave her the properties as gifts.
 

 ¶ 5. The record also contains tax receipts that show Ann paid the ad valorem taxes on these properties after 2003. The record also contains the declarations page from an insurance policy, dated January 10, 2005, which shows that Ann was the named insured on a homeowner’s policy that insured the Hinds County property.
 

 ¶ 6. The evidence also established that Laura inherited a good deal of cash from her late husband, Taz Morrison, when he died in 1990. Laura invested this cash in several CDs, which initially were titled in her name only. Ann was added as a joint owner on the CDs. Ann testified that Laura added her as an owner in 1999, while Laura testified that she had no knowledge of how Ann was added as an owner.
 

 ¶ 7. Sometime thereafter, Ann acquired sole ownership of at least some of the CDs. Ann testified that on a Sunday afternoon in 2001 Laura came to her. Laura said she wanted to give Ann some CDs as gifts. Laura stated that she had already given various gifts to her other children, but she had never given Ann anything. Also, Laura was tired of paying taxes and just wanted “it out of [her] name.” According to Ann, after that conversation, the two of them went to the bank where Laura, who was in complete control of the situation, gave Ann sole ownership of some of the CDs. The events at the bank were not explained in detail nor were any documents introduced to corroborate Ann’s story. Laura denied that she ever had the alleged conversation with Ann in 2001, and she also denied the alleged events at the bank had ever occurred.
 

 ¶ 8. Seven CD receipts were admitted into evidence that state the following:
 

 Amount of Today’s Date Maturity Date Deposit
 

 October 12, 1999 October 12, 2002 $10,000
 

 October 21,1999 October 21, 2002 $20,000
 

 November 17, 1999 November 17, 2002 $20,248.42 December 03, 1999 December 03, 2002 $24,628.37 December 03, 1999 December 03, 2002 $55,000 October 21,2002 June 21,2003 $30,007.32
 

 November 20, 2002 November 20, 2005 $24,252.87
 

 The receipts state that the owners of the CDs were “Laura L. Yarbrough or Ann
 
 *868
 
 Patrick.”
 
 [1]
 
 The receipts also state: “When the conjunction ‘or’ appears between names, the [CD] shall be payable to any depositor named herein.”
 

 ¶ 9. Laura’s complaint in this case was filed on March 4, 2009, approximately seven years after most of these CDs had matured, yet there was no evidence produced to show what happened to the money in these CDs after the CDs had matured. These receipts admitted in evidence provide nothing but a snapshot in time.
 

 ¶ 10. In her complaint and her testimony, Laura made allegations that Ann wrongfully took sole ownership of some of these CDs, but it is not clear to which CDs Laura was referring or if she was referring to all of them. Ann’s testimony was that Laura had cashed in most of these CDs by the date of trial. Ann testified that she received only two of the CDs as gifts — the one dated November 17, 1999, for $20,248.42, and the one dated October 12,1999, for $10,000.
 

 ¶ 11. In complete contradiction with her earlier testimony that she never executed the deeds or gave Ann any of the CDs, Laura also testified that she transferred the assets to Ann in order to qualify for Medicaid. According to Laura, Ann persuaded her to do this. Laura stated: “[Ann] told me if I’d sign everything I had over to her she would get me on Medicaid.” Keith testified that, sometime around 2002, Ann talked to Laura about Medicaid eligibility. Keith testified: “[Ann] said, don’t worry about it, she was going to get mother on Medicaid.” Ann denied that she ever mentioned Medicaid to Laura or Keith.
 

 ¶ 12. At the conclusion of the trial, the chancellor entered a judgment in favor of Ann. Laura’s appeal was deflected to this Court for review.
 

 STANDARD OF REVIEW
 

 ¶ 13. This Court will not disturb the findings of a chancellor when supported by substantial credible evidence unless the chancellor abused his or her discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied.
 
 Sanderson v. Sanderson,
 
 824 So.2d 628, 625-26 (¶ 8) (Miss.2002). Legal questions are reviewed de novo.
 
 Russell v. Performance Toyota, Inc.,
 
 826 So.2d 719, 721 (¶ 5) (Miss.2002).
 

 ANALYSIS
 

 1. Did Ann and Laura have a confidential relationship?
 

 ¶ 14. The chancellor found that Laura failed to establish the existence a confidential relationship between herself and Ann at the time alleged gifts were made; therefore, the presumption of undue influence was not raised. Laura argues that this finding was in error.
 

 ¶ 15. With respect to inter vivos gifts, when it is shown that a confidential relationship existed between the donor and the donee at the time the gift was made, a presumption of undue influence is raised, and the burden shifts to the donee to rebut the presumption.
 
 Smith v. Smith,
 
 574 So.2d 644, 651 (Miss.1990). A confidential relationship is akin to a fiduciary relationship, and it ‘“arises when a dominant, overmastering influence controls over a dependent person or trust justifiably reposed.’”
 
 Id.
 
 at 650 (quoting
 
 Mullins v. Ratcliff,
 
 515 So.2d 1183, 1191-192 (Miss.
 
 *869
 
 1987)). The party who claims the existence of the confidential relationship must establish it by clear and convincing evidence.
 
 In re Estate of Lane,
 
 930 So.2d 421, 425 (¶ 12) (Miss.Ct.App.2005) (citations omitted).
 

 ¶ 16. This Court looks to the following factors to determine whether a confidential relationship exists:
 

 (1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has their medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one and another.
 

 Id.
 
 at (¶ 13).
 

 ¶ 17. At trial, the testimony on this issue was limited. The following exchange occurred between Laura and Ann’s attorney on cross-examination:
 

 Q: Now, in the year 2000, 2001, 2002, in those years there you were taking care of your business, weren’t you?
 

 A: Right.
 

 Q: And you drove your car, didn’t you? A: (No response.)
 

 Q: You drove to the store and drove your car wherever you wanted to go, didn’t you?
 

 A: I do now.
 

 Q: You do now. If you needed to go to the doctor or the store, wherever you went, you went; is that right? A: Right.
 

 Q: You took care of yourself?
 

 A: That’s right.
 

 Q: You cooked your food?
 

 A: Right. Still do.
 

 Q: Still do. You take care of all your clothing.
 

 A: Right.
 

 Q: Okay. Go to the doctor whenever you need to?
 

 A: Right.
 

 Then the following exchange occurred between Ann and her attorney on direct examination:
 

 Q: Okay. In about this range of 2000, 2001, 2002, 2003, was your mother taking care of herself?
 

 A: She was. She had some strokes in '04.
 

 Q: Okay. So as far as — was she able to drive herself—
 

 A: She was. But after she had the strokes in '04, she doesn’t trust herself to drive in Jackson. I take her to the doctor. She and my sister both.
 

 Q: Was she able to take her medicine on time during that period of time?
 

 A: My sister that lives with her says sometimes she gets her medicine mixed up. So I suggested she get a medicine box and fix it for her. But sometimes she still doesn’t take her medicine just exactly like she should.
 

 Q: But she — during that period of time she was able to feed and clothe herself?
 

 A: She was.
 

 Q: Take care of her personal hygiene?
 

 A: Right.
 

 Q: Okay. So, as far as you know, she was — up to that point in time she was handling her own business; is that correct?
 

 A: She was.
 

 [[Image here]]
 

 
 *870
 
 Q: Okay. What kind of relationship do you have with your mother?
 

 A: We’ve always had a good relationship. Never had any problems.
 

 Q: How would you characterize your mother as far as being a strong-willed person or a weak-willed person?
 

 A: Very strong will.
 

 Q: Does anybody ever bulldog your mother into doing anything she didn’t want to do?
 

 A: Not on your life.
 

 This was the only testimony at trial that went to the issue of whether a confidential relationship existed between Laura and Ann.
 

 ¶ 18. In her brief before this Court, Laura puts a lot of emphasis on the fact that she had a stroke in 2004 and that, after that stroke, Ann drove her to the doctor and made sure she was properly taking her medications. However, the pertinent question is whether a confidential relationship existed at the time the alleged gifts were made.
 
 See Estate of Lane,
 
 930 So.2d at 426 (¶ 14). There was substantial evidence from which the chancellor could have found that the CDs were transferred to Ann in 2001 and that the real property was conveyed in 2003. Therefore, the stroke and its aftermath are not relevant to this inquiry.
 

 ¶ 19. Turning to the seven factors listed above and applying them to the facts as they existed at the time the alleged gifts were made, only three of the factors could conceivably point in the direction of a confidential relationship. Ann and Laura maintained a close relationship. They maintained joint accounts, as evidenced by the CDs titled in the names of “Laura L. Yarbrough or Ann Patrick.” And Laura was of advanced age. The other four factors argue against a confidential relationship. According to Laura’s own testimony, she took care of herself. She provided her own transportation. She saw to her own medical care. In addition, there was no evidence that she was mentally or physically weak. And Ann did not have Laura’s power of attorney.
 

 ¶ 20. We also note that the Mississippi Supreme Court has ruled that:
 

 A deed from a parent to a child alone and of itself raises no presumption of undue influence since, in the absence of evidence to the contrary, the parent is presumably the dominant party. This is true even though the parent is aged, or aged and infirm.
 

 Id.
 
 at 425 (¶ 11) (quoting
 
 Thomas v. Jolly,
 
 251 Miss. 448, 454-55, 170 So.2d 16, 19 (1964)).
 

 ¶ 21. Based on the evidence produced at trial and the applicable law, the chancellor was not manifestly in error when he found that Laura failed to establish a confidential relationship by clear and convincing evidence. Accordingly, this issue is without merit.
 

 2. Was Ann required to establish the elements of an inter vivos gift?
 

 ¶ 22. Laura next argues that Ann failed to prove that she was given the real property and CDs as inter vivos gifts. Laura correctly points out that, as a general rule, the donee bears the burden of proof. Normally, the donee must establish by clear and convincing evidence the following elements: (a) a donor competent to make a gift; (b) a voluntary act of the donor with donative intent; (c) that the gift was complete and not conditional; (d) delivery by the donor; and (e) that the gift was irrevocable.
 
 In re Estate of Ladner,
 
 909 So.2d 1051, 1054 (¶ 9) (Miss.2004) (citation omitted). However, there are some special rules that apply to this case be
 
 *871
 
 cause the alleged gifts were real property and CDs.
 

 ¶ 23. With respect to the real property, a person who seeks to set aside a facially valid deed bears the burden of proof.
 
 Mullins,
 
 515 So.2d at 1190. Here, the two deeds were facially valid. Therefore, it was Laura’s burden to establish some ground to set them aside.
 

 ¶ 24. In addition, whenever a CD is titled in the names of two or more persons, payable to any of the persons named, it is presumed that those persons are owners of the account.
 
 In
 
 re
 
 Last Will and Testament and Estate of Dunn v. Reilly,
 
 784 So.2d 935, 942 (¶ 21) (Miss. 2001) (citing
 
 Madden v. Rhodes,
 
 626 So.2d 608, 616 (Miss.1993)). “When an account is held jointly in the name of one depositor or another, ‘each depositor is allowed to treat joint property as if it were entirely his own.’ ”
 
 DeJean v. DeJean,
 
 982 So.2d 443, 449-50 (¶ 14) (Miss.Ct.App.2007) (quoting
 
 Drummonds v. Drummonds,
 
 248 Miss. 25, 31, 156 So.2d 819, 821 (1963)). That presumption of ownership may be overcome “‘upon proof of forgery, fraud, duress, or an unrebutted presumption of undue influence.’ ”
 
 Reilly,
 
 784 So.2d at 942 (¶ 21) (quoting
 
 Madden,
 
 626 So.2d at 617).
 

 ¶ 25. Here, the CDs were at one point titled in the names of “Laura L. Yar-brough or Ann Patrick,” and sometime thereafter Ann acquired sole ownership of some of the CDs. Therefore, it was Laura’s burden to disprove Ann’s right to the CDs.
 

 ¶ 26. In conclusion, Laura’s argument that Ann failed to establish the elements of an inter vivos gift by clear and convincing evidence must fail because the burden of proof was on Laura to disprove Ann’s rights to the real property and the CDs. Accordingly, this issue is without merit.
 

 3. Should equity impose a constructive trust?
 

 ¶ 27. Lastly, Laura argues that equity should impose a constructive trust on the real property and the CDs for her benefit. She argues that Ann has acquired title to these assets by wrongful means. Specifically, Laura claims that she transferred the assets to Ann in order to qualify for Medicaid and that Ann persuaded her to do that.
 

 ¶ 28. The Mississippi Supreme Court has defined a constructive trust as follows:
 

 A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.
 

 Alvarez v. Coleman,
 
 642 So.2d 361, 367 (Miss.1994). The proponent of such a trust must show its necessity by clear and convincing evidence.
 
 Id.
 
 at 368.
 

 ¶ 29. Furthermore, to receive the aid of equity a claimant must have clean hands.
 
 Ellzey v. James,
 
 970 So.2d 193, 195 (¶ 10) (Miss.Ct.App.2007). The clean-hands doctrine has often been invoked to deny relief to a claimant who had transferred property to another to defraud a governmental agency and then was disappointed to discover that the transferee refused to return the property.
 
 Id.
 
 at 196 (¶ 14); see
 
 also Collins v. Collins,
 
 625 So.2d 786, 789-90 (Miss.1993);
 
 Walters v. Patterson,
 
 531 So.2d 581, 584 (Miss.1988).
 

 ¶ 30. In
 
 Ellzey,
 
 a man deeded some mineral rights to his girlfriend in order to
 
 *872
 
 maintain his eligibility for Medicaid.
 
 Ell-zey,
 
 970 So.2d at 198-94 (¶4). The man later filed suit and asked the chancellor to use his equitable powers to return the mineral rights to him.
 
 Id.
 
 at 194 (¶ 7). This Court affirmed the chancellor’s judgment denying relief, stating:
 

 In this case, Ellzey transferred the mineral interests to James in order to conceal his assets from Medicaid.... Ellzey invoked the aid of the chancery court to remedy a problem created by his own fraudulent act. The chancellor appropriately held that Ellzey was not entitled to relief because he sought to use “the chancellor’s hands to draw equity from a source his own hands had polluted.”
 

 Id.
 
 at 196 (¶ 14).
 

 ¶ 31. Here, Laura claims that she transferred her assets to Ann in order to qualify for Medicaid. She admittedly tried to conceal assets from a governmental agency in order to obtain benefits to which she was not rightly entitled. Her hands were unclean, and the chancellor was correct to deny her the aid of equity. Accordingly, this issue is without merit.
 

 ¶ 32. THE JUDGMENT OF THE CHANCERY COURT OF HINDS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., MYERS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. IRVING, P.J., CONCURS IN PART AND IN THE RESULT. RUSSELL, J., NOT PARTICIPATING.
 

 [1]
 

 . Ann testified that Laura’s maiden name was Lewis and that Laura sometimes used "L” as her middle initial.