JAMES, J.,
for the Court:
¶ 1. Jenanette Brown and Edward Wilson filed a complaint in the Chancery *534 Court of Alcorn County against Virginia Jones, Suzette Jones Marlar, Annette Stringer, and Virginia Ann Finzel,[1] seeking to set aside the Last Will and Testament of J.T. Smith, which had been submitted to probate by Jones. The lawsuit also sought to set aside several inter vivos gifts given by Smith to Jones. Following a trial, the chancellor set aside the inter vivos gifts and upheld the will. Brown appeals raising the following issues: (1) whether a presumption of undue influence arose regarding the validity of the will and whether there was substantial evidence to support the validity of the will; and (2) whether the chancellor erred in failing to impose a constructive trust. Jones cross-appeals raising the following issue: whether the chancellor erred in finding that she failed to overcome the presumption of undue influence regarding the inter vivos gifts. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
¶ 2. J.T. Smith suffered from various health issues that began in the mid-1980s. On December 28, 2004, Smith fell in his home and was transported to Magnolia Hospital in Corinth, Mississippi. After developing renal difficulties, Smith was transported to North Mississippi Medical Center in Tupelo, Mississippi, where he remained hospitalized until February 5, 2005. During this period, Virginia Jones, Smith’s sister-in-law, began to visit Smith daily, both while he was hospitalized in Tupelo, and upon his return home.[2] Soon after, Jones began assisting Smith with personal and business matters; for instance, Jones applied for veteran’s benefits on Smith’s behalf, obtained a hospital bed for Smith’s home, and arranged for twenty-four-hour-a-day in-home caregivers.
¶ 3. During his hospitalization, Smith told Jones that he wanted her to be able to sign checks on his behalf; Jones then told Smith that he needed a power of attorney. Nevertheless, Jones wént to AmSouth Bank, where Smith maintáined a checking account, and obtained a checking-account-maintenance form. Jones completed the form, checking the “add owner name” box. Jones then brought the form to North Mississippi Medical Center, where Smith signed the form. Thereafter, Jones was co-owner of Smith’s checking account, which contained a balance in excess of $529,000. Jones then engaged attorney Jimmy Fisher and had him prepare a power of attorney for Smith. Jones brought the power of attorney to the hospital in Tupelo, where Smith signed it on January 19, 2005. The power of attorney was notarized by Marsha Oliver, a hospital employee.
¶ 4. In late March or early February 2005, Jones told Smith that AmSouth was taking advantage of him by not paying the maximum interest on his checking account. According to Jones, Smith told her to take care of the situation. On February 7, 2005, Jones moved $150,000 from Smith’s AmSouth account to SouthBank, where she purchased three certificates of deposit (“CDs”) for $50,000 each. All three CDs were purchased in Jones’s and Smith’s names and each named one of Jones’s three daughters: Suzette Jones Marlar, Annette Jones Stringer, and Virginia Ann *535 Finzel, respectively.[3] The following week, on February 14, 2005, Jones withdrew $100,000 from Smith’s AmSouth account and deposited the funds into an account at CB & S Bank. Finally, on April 26, 2005, Jones withdrew $200,000 from Smith’s AmSouth account and deposited the funds into four $50,000 CDs in SouthBank. Again, three of the CDs listed Jones and Smith as co-owners and listed one of Jones’s three daughters. The fourth CD named Jones, Smith, and Jones’s granddaughter, ■ Sydney Mitchell; however, Mitchell’s name was later removed.[4]
¶ 5. On July 26, 2005, Smith executed his Last Will and Testament. The will was prepared by attorney James Porter Dean. Jones picked' up the will at Dean’s office and brought the will to Smith’s home. Smith executed the will at approximately 5 p.m. The execution of the will was witnessed by two of Smith’s caretakers and executed in Jones’s presence. The will left all of Smith’s property to his nieces and nephew, Suzette Jones Marlar, Annette Springer, Virginia Ann Finzel, Jeanette Brown, and Edward Wilson Jr. Sometime after executing the will, Smith signed an additional page styled “itemized listing attachment,” which essentially left his entire estate to Jones. Jones testified that this additional page was signed by Smith in her presence. The document was not witnessed by anyone.
¶ 6. Smith died on May 28, 2006, at the age of eighty-six. At the time of his death, Wilson and Brown, the children of Smith’s sister, Audrie, were Smith’s only living blood relatives. On June 1, 2006, Jones submitted Smith’s will to probate in the Chancery Court of Alcorn County. A decree admitting the will to probate was entered and letters testamentary were issued. On October 2, 2007, Jones petitioned to close the estate and to be discharged as executor. That same day, Jones initiated publication of process for Brown and Wilson.
¶ 7. On October 16, 2007, Brown filed a motion to construe the will and a motion to remove Jones as executor. By orders entered on December 18, 2007, the fourth page of Smith’s will, the “Itemized Listing Attachment,” was found to be non-testamentary in nature and declared null and void, and Jones was removed as .executor and replaced with the chancery clerk.
¶ 8. On June 18, 2008, Brown filed a motion for an accounting. After being granted leave to amend the motion, Brown amended it by filing a complaint against Jones and her daughters, Suzette Marlar, Annette Stringer, and Virginia Finzel. The complaint sought to set aside the CDs, or inter vivos gifts, alleging that the gifts, which totaled $484,039.79, were the product of undue influence. The complaint further sought to set aside Smith’s will, alleging that it too was the product of undue influence on the part of Jones.
¶ 9. A trial was held April 16-17, 2012. At the conclusion of the trial, the chancek lor invalidated the inter vivos gifts, finding that a confidential relationship existed between Jones .and Smith, which created a rebuttable presumption that the gifts were the product of undue influence which Jones had failed to rebut. The chancellor ordered that the funds be returned to the estate and distributed pursuant to the terms of the will. In addition, the chancellor ordered that $34,039.79, the balance of *536 Smith’s checking account at the time of his death, also be restored to the estate. The chancellor held that the will was valid, finding that Brown had failed to demonstrate that Jones had abused her confidential relationship with Smith in the procurement of the will.
¶ 10. Brown filed a motion for relief from the judgment or alternative relief, requesting that the chancellor: award the estate a judgment against the defendants for $484,039.79 with interest to be set by the trial court, impose a constructive trust, and set aside the will and administer Smith’s estate by intestate succession. On November 2, 2012, the chancellor entered an order denying Brown’s motion for relief from the judgment. However, the chancellor did direct that any interest actually earned on the moneys be returned to the estate.
¶ 11. Brown appeals and Jones cross-appeals.
DISCUSSION
¶ 12. Upon review, this Court “will not reverse a chancery court’s findings, be they of ultimate fact or of evidentiary fact, where there is substantial evidence supporting those findings.” Estate of Langston v. Williams, 57 So.3d 618, 619 (¶ 6) (Miss.2011) (quoting Estate of Dunn v. Reilly, 784 So.2d 935, 939 (¶11) (Miss. 2001)). Likewise, “[t]he findings will not be disturbed unless the chancellor abused his discretion, was manifestly wrong or clearly erroneous, or [applied] an erroneous legal standard[.]” Madden v. Rhodes, 626 So.2d 608, 616 (Miss.1993).
I. Whether Jones failed to overcome the presumption of undue influence regarding the inter vivos gifts.
¶ 13. We begin our analysis with Jones’s cross-appeal. On cross-appeal, Jones argues that the chancellor erred in finding that Jones failed to rebut the presumption of undue influence relative to the CDs that were the subject of the inter vivos gifts. We disagree.
¶ 14. Pursuant to Mississippi Code Annotated section 81-5-63 (Supp. 2013), “the creation of a certificate of deposit creates an automatic presumption of ‘intent’ to give ownership to the persons named on the CD, whether living or as survivors. Such presumptive title may be defeated upon proof of forgery, fraud, duress, or ... [the] unrebutted presumption of undue influence.” Foster v. Ross, 804 So.2d 1018, 1022 (¶ 14) (Miss.2002) (citing Madden, 626 So.2d at 617). Likewise, “where a confidential relationship exists, there is a presumption of undue influence concerning an inter vivos gift [and][s]uch gifts are presumed invalid.” In re Estate of Reid, 825 So.2d 1, 5 (¶ 13) (Miss.2002) (citing Madden, 626 So.2d at 619).
¶ 15. The Mississippi Supreme Court has defined a confidential relationship as follows:
Whenever there is a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter’s dependency upon the former, arising either from weakness of the mind or body, or through trust, the law does not hesitate to characterize such a relationship as fiduciary in character.
Foster, 804 So.2d at 1022-23 (¶ 15) (citing Madden, 626 So.2d at 617). In other words, “a confidential relationship exists when one has a dominant, overmastering influence over a person dependant upon him.” Id. Furthermore, “a confidential relationship!,] such as would impose the duties of a fiduciary[,] does not have to be a legal one, but may be moral, domestic!,] *537 or personal.” Mullins v. Ratcliff, 515 So.2d 1183, 1191 (Miss.1987).
¶ 16. On appeal, neither party disputes that a confidential relationship existed between Jones and Smith. Nevertheless, we note that when determining whether a confidential relationship exists, the following factors are to be considered:
(1) whether one person has to be taken care of by others, (2) whether one person maintains a close relationship with another, (3) whether one person is provided transportation and has [his] medical care provided for by another, (4) whether one person maintains joint accounts with another, (5) whether one is physically or mentally weak, (6) whether one is of advanced age or poor health, and (7) whether there exists a power of attorney between the one [person] and another.
Reid, 825 So.2d at 5 (¶ 13). The chancellor found that the proof, as to each factor, supported the existence of a confidential relationship between Jones and Smith.
¶ 17. Once the existence of a confidential relationship is established, the burden shifts to the beneficiary to rebut the presumption of undue influence by clear and convincing evidence. Id. at (¶ 14). Our supreme court has established a three-pronged test to determine whether the presumption of undue influence has been successfully rebutted: (1) that the grantee/beneficiary acted in good faith, (2) that the grantor had full knowledge and deliberation of his actions and the consequences of those actions, and (3) that the grantor exhibited independent consent and action. Murray v. Laird, 446 So.2d 575, 578 (Miss.1984).
A. Good Faith
¶ 18. The Mississippi Supreme Court has identified five factors to consider when determining whether a gift was executed in good faith: (1) the identity of the initiating party in seeking preparation of the instrument; (2) the place of the execution of the instrument and in whose presence; (3) the consideration and fees paid, if any; (4) by whom they were paid; and (5) the secrecy and openness of the execution of the instrument. Id.
¶ 19.. The gifts at issue in this case are funds that Jones gained access to after becoming co-owner of Smith’s bank account and after becoming Smith’s power of attorney. According to Jones, she was added to Smith’s bank account and given power of attorney at Smith’s request. Smith asked Jones to help him manage his business affairs and to help him sign checks because his arthritis prevented him from signing checks himself. It was Jones who then advised Smith that he would need a power of attorney, and Jones who took all necessary steps with the bank to gain access to Smith’s account. On several occasions Smith told Jones that she was the only person that he trusted.
¶ 20. Jones testified that she obtained the account-maintenance form from Patricia Nelson, an employee of AmSouth Bank. Jones brought the form to the hospital in Tupelo, where Smith signed it in Jones’s presence. Jones testified that no one else was present when the form was signed. Nelson testified that she had no recollection of the events aside from the fact that the form was obtained by Smith. Nelson also testified that, according to bank procedure, before adding a third party to an account, she would normally speak to the account holder or require some type of written authorization from the account holder. Nelson had no recollection of speaking to Smith or of receiving any type of authorization apart from the completed form. There was no testimony indicating that any consideration was given to Smith *538 by Jones when she became co-owner of his bank account, which held over $500,000.
¶ 21. Likewise, it was Jones who took all necessary action in obtaining and executing the power of attorney. After informing Smith that he needed a power of attorney, Jones hired Fis'her to draw up the instrument and brought it to the hospital in Tupelo, where Smith executed the instrument in Jones’s presence. There is no evidence that Smith had any contact with Fisher.
¶ 22. In sum, Jones initiated the preparation of the power of attorney and was the only person active in obtaining the account-maintenance form, which added her to Smith’s account as co-owner. Likewise, she was the only person to discuss either the power of attorney or the account change with Smith. Using these instruments, Jones moved approximately $484,039.79 out of Smith’s account and deposited the funds into various CDs to the benefit of Jones and her daughters.
¶ 23. Considering the foregoing, we find that the chancellor did not err in finding that Jones failed to satisfy the good-faith prong of the test and that the chancellor’s decision was supported by substantial evidence.
B. Knowledge and Deliberation
¶ 24. In considering the second prong under the test to determine whether Jones rebutted the presumption of undue influence, this Court considers the following:
(a) [the grantor’s] awareness of his total assets and their general value, (b) an understanding by him of the persons who would be the natural inheritors of his bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls his finances and business and by what method, and if controlled by another, how dependent ... the grantor [is] on him and how susceptible to his influence.
Mullins, 515 So.2d at 1195.
¶ 25. The chancellor found that Jones offered no proof that Smith read the account-maintenance form prior to his signing it, nor that anyone explained to him how the form would affect the ownership of his account. Likewise, Jones did not offer evidence that Smith appreciated the value of his assets or how executing the account-maintenance form and power of attorney would affect the distribution of his estate after his death. In fact, apart from Jones’s testimony, there is little evidence demonstrating that Smith actually intended to make a gift. The testimony at trial, including Jones’s own testimony, clearly established that Smith wanted Jones on his account in order for her to sign checks on his behalf. Jones testified that the money was moved into CDs in order to maximize Smith’s interest; however, Jones offered no explanation as to why her daughters and her granddaughter were included on the CDs. In addition, the interest on the CDs, which again were purportedly obtained to maximize Smith’s interest, had maturity dates well past Smith’s expected and actual life span.
¶ 26. Furthermore, no evidence was offered to demonstrate that Smith knew how his finances were controlled apart from the fact that they were controlled by Jones. Several witnesses testified that Jones was the only person Smith trusted to handle his business. Jones stated that her relationship-with Smith was “founded on trust” and, on more than one occasion, testified that she was the only person that Smith trusted. Between February 7, 2005, and *539 April 26, 2005, Jones moved $450,000 from Smith’s checking account to other banking institutions. The money was placed in CDs. The mailing address on all the CDs was Jones’s home address, not Smith’s. Jones testified that she received all bank statements and that she showed them to Smith. At trial, no one testified to ever seeing a bank statement in Smith’s home. Geraldine Lambert, one of Smith’s caretakers, testified that Jones always retrieved the mail from Smith’s mailbox; however, she never saw a bank statement in Smith’s home.
¶27. The chancellor found that Jones failed to rebut the presumption of undue influence as to the second prong. We find that the chancellor’s decision was supported by substantial evidence.
C. Independent Consent and Action
¶ 28. The third prong of the test to rebut the presumption of undue influence requires' Jones to demonstrate, by clear and convincing evidence, that Smith exhibited independent consent and action. We have held that “the best way to show independent consent and action is to provide advice of (a) a competent person, (b) disconnected from the grantee[,] and (c) devoted wholly to the grantor/testator’s interests.” Howell v. May, 983 So.2d 313, 320 (¶ 25) (Miss.Ct.App.2007) (citing Dean v. Kavanaugh, 920 So.2d 528, 537 (¶ 46) (Miss.Ct.App.2006)).
¶ 29. We find that the chancellor’s decision that Jones failed to demonstrate independent consent and action was supported by substantial evidence. Although there was some testimonial evidence indicating that Smith spoke to an attorney in 2004 regarding the preparation of his will, there was no evidence offered demonstrating that Smith spoke to anyone about the money in his bank account apart from Jones. In fact, the chancellor found, and the evidence indicates, that from December 28, 2004, until his death on May 23, 2006, Smith received all legal and financial advice from Jones. As noted above, it was Jones that went to Smith’s bank and obtained the account-maintenance form. Nelson, the AmSouth employee, had no recollection of speaking to Smith about the changes to his account. Likewise, it was Jones who advised Smith that he needed a power of attorney and Jones who hired Fisher to prepare it. There is no evidence that Smith ever met Fisher either prior to, or after, the preparation of the instrument. Perhaps most telling is Jones’s own testimony. According to Jones, “[Smith] did not discuss business with anybody except ... me ... because he said I was the only person he trusted.” Similarly, during Jones’s deposition, the following exchange took place:
A. [Smith] did not tell his business to anybody.
Q. I guess that the same thing is true of the changes in the bank accounts, putting you on the bank account, and moving the CDs that there was no independent person that you know of that [Smith] talked to about that?
A. He did not.
¶30. The chancellor found that Jones failed to demonstrate independent consent and action to rebut the presumption of undue influence. We find that the chancellor’s decision was supported by substantial evidence.
¶ 31. Considering all the evidence, and the three-pronged test used to determine whether the presumption of undue influence has been rebutted, we find that the chancellor did not err in finding that Jones failed to rebut the presumption of undue influence regarding the inter vivos gifts and that the chancellor’s decision was sup *540 ported by substantial evidence. Accordingly, this issue is without merit.
II. Whether a presumption of undue influence arose regarding the validity of the will and whether there was substantial evidence to support the validity of the will.
¶ 32. On direct appeal, Brown argues that the chancellor erred in finding that a presumption of undue influence did not arise regarding the'will. He also claims that the validity of the will was not supported by substantial evidence. Brown further argues that the chancellor’s findings were contradictory in that the chancellor found that a presumption of undue influence arose regarding the inter vivos gifts, but not the testamentary gifts. We disagree.
¶ 33. Where a confidential relationship exists between a testator/grant- or' and a beneficiary/grantee, the rules of law differ regarding testamentary gifts and inter vivos gifts. As our supreme court noted in Madden:
The prior holdings of this Court indicate a presumption of undue influence only arises in the context of gifts by will when there has been some abuse of the confidential relationship, such as some involvement in the preparation or execution of the will. On the other hand, with a gift inter vivos, there is an automatic presumption of undue influence even without abuse of the confidential relationship. Such gifts are presumptively invalid.
Madden, 626 So.2d at 618. For testamentary gifts, “[i]f it is determined that a confidential relationship exists, an abuse of that relationship must be shown for the [contestants to raise a proper presumption of undue influence.” Gray v. Estate of Kimbrough, 134 So.3d 281, 285 (¶ 13) (Miss.2014) (citing Costello v. Hall, 506 So.2d 293, 298 (Miss.1987)). “[E]ven when a confidential relationship can be said to exist between the parties!,] • • • the beneficiary under the will must have used that relationship for his personal gain or to thwart the intent of [the] testator.” Costello, 506 So.2d at 298. Thus, “[t]he existence of a confidential relationship, standing alone, does not raise a presumption of undue influence.” Kimbrough, 134 So.3d at 285 (¶ 13) (citing In re Estate of Laughter, 23 So.3d 1055, 1064 (¶ 37) (Miss.2009)). Finally, we note that our caselaw has extended the doctrine of undue influence to nonbeneficiaries. Id. at (¶ 16); see also Weston v. Lawler’s Estate, 406 So.2d 31, 34 (Miss.1981) (“Undue influence over a testator, while not exercised by a beneficiary under the will, may be done ... through an agency or a third person.”).
¶ 34. Therefore, in order to raise a presumption of undue influence regarding the will, Brown was required to first establish a confidential relationship between Jones and Smith. Brown was then required to demonstrate that Jones abused that relationship in the preparation or execution of the will. As noted above, the chancellor found that a confidential relationship existed between Jones and Smith. However, regarding the will, the chancellor found that there was no proof that Jones abused the confidential relationship, or was involved in the preparation and execution of the will.
¶ 35. According to the testimony of John Ross,[5] the will was prepared as a result of a meeting between Smith and attorney James Dean. Dean told Ross *541 that he met with Smith, at Smith’s request, regarding the preparation of a will and that the meeting later took place. Jones’s uncontradicted testimony was that she was not involved in the procurement of the will. The evidence at trial did not demonstrate that Jones was involved in the will’s execution apart from the fact that she transported the will from Dean’s office to Smith’s residence and was present at its execution. The chancellor found that these circumstances were “not so suspicious as to create any adverse presumptionfs].”
¶ 36. The will divides Smith’s estate equally among his nieces and nephew. The testimony of the various witnesses, including Brown, Wilson, Stringer, Marlar, and Finzel indicated that Smith, who was childless, treated his nieces and nephew as his own children. In addition, the testimony also demonstrated that Smith intended for his real property to pass within his family. Furthermore, the chancellor found that, although Smith suffered from various physical ailments, there was ample proof that Smith was mentally competent at the time he executed his will.
¶ 37. We find that the chancellor correctly found that Brown failed to demonstrate an abuse of the confidential relationship between Jones and Smith and, therefore, a presumption of undue influence did not arise regarding the will. Furthermore, we find that substantial evidence existed to support the validity of the will. In summary, the chancellor did not abuse his discretion or apply an erroneous legal standard; nor was he manifestly wrong or clearly erroneous in upholding Smith’s will. Accordingly, this issue is without merit.
III. Whether the chancellor erred in denying Brown’s motion to impose a constructive trust.
¶ 38. Finally, Brown argues that the chancellor erred in failing to impose a constructive trust upon $450,000, which was the subject of the invalidated inter vivos gift. We disagree.
¶ 39. A constructive trust has been defined as follows:
A constructive trust is one that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy.
Yarbrough v. Patrick, 65 So.3d 865, 871 (¶ 28) (Miss.Ct.App.2011) (quoting Alvarez v. Coleman, 642 So.2d 361, 367 (Miss.1994)). A constructive trust is “a means by which one who unfairly holds a property interest may be compelled to convey that interest to another to whom it justly belongs.” Van Cleave v. Estate of Fairchild, 950 So.2d 1047, 1054 (¶29) (Miss.Ct.App.2007). A constructive trust “arises by implication from the relationship and conduct of the parties and may be established by parol testimony.” Id. “It is the relationship plus the abuse of confidence that authorizes a court of equity to construct a trust for the benefit of the party whose confidence has been abused.” Id. at 1054-55 (¶ 29). Finally, “the proponent of such a trust must show its necessity by clear and convincing evidence.” Yarbrough, 65 So.3d at 871 (¶28).
¶ 40. Here, we find that Brown has failed to show, by clear and convincing evidence, that a constructive trust is necessary. The chancellor found that a confidential relationship existed between Jones *542 and Smith and that Jones failed to rebut the presumption of undue influence, which arose due to that confidential relationship. However, the chancellor did not find that Jones abused the confidential relationship, only that she failed to rebut the presumption of undue influence that arose by operation of law due to the existence of a confidential relationship. Absent a finding of fraud, duress, abuse of confidence, commission of wrong, unconscionable conduct, or the use of other questionable means, we are not compelled to impose a constructive trust.
¶ 41. Furthermore, a constructive trust is typically imposed where the aggrieved party has no adequate remedy other than through equity. As our supreme court has stated, “[a] constructive trust is raised by equity to satisfy the demands of justice.” Church of God Pentecostal, Inc. v. Freewill Pentecostal Church of God Inc., 716 So.2d 200, 207 (¶ 23) (Miss.1998). The supreme court has further noted:
A constructive trust is a fiction of equity. It is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee. The equity must shape the relief and courts are bound by no unyielding formula.
Id. (quoting Russell v. Douglas, 243 Miss. 497, 505-06, 138 So.2d 730, 734 (1962)).
¶ 42. However, here, we fail to see why the remedy ordered by the chancellor was inadequate, necessitating the imposition of a constructive trust. The chancellor ordered that the $450,000, which was removed from Smith’s AmSouth account and placed in the various CDs, and any interest earned upon the funds, be returned to the estate and distributed pursuant to the terms of the will.
¶43. We find that the chancellor did not abuse his discretion by failing to impose a constructive trust and Brown has failed to demonstrate, by clear and convincing evidence, that a constructive trust is necessary here. Accordingly, this issue is without merit.
¶ 44. THE JUDGMENT OF THE AL-CORN COUNTY CHANCERY COURT IS AFFIRMED ON DIRECT APPEAL AND CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED EQUALLY BETWEEN THE APPELLANTS/CROSS-APPELLEES AND THE APPELLEES/CROSS-APPEL-LANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR.

. For clarity and convenience, the appellants/cross-appellees, Brown and Wilson, will be collectively referred to as "Brown”; and the appellees/cross-appellants, Jones, Marlar, Stringer, and Finzel, will be collectively referred to as "Jones” throughout this opinion except as necessary to distinguish individuals among the parties.

. Jones was the sister of Smith's wife, Mattie, who died in 1978.

. The testimony indicates, and the chancellor found, that Jones's daughters were unaware of this arrangement, whereby they each would receive $50,000, at the time of the purchase.

. The various CDs are the disputed inter vivos gifts at issue in the litigation.

. At the time of the trial, James Porter Dean, the attorney who drafted the will for Smith, was deceased. John C. Ross, an attorney and former chancellor who worked with Dean during the time period that Dean prepared the will, gave testimony regarding the preparation of the will.