# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-CA-01229-COA

IN THE MATTER OF THE ESTATE OF ANITA        APPELLANT
VIRGINIA RISH HITT, DECEASED: SHERON
YANCEY DUNN

v.

CHARLOTTE YANCEY HART, YVONNE        APPELLEES
YANCEY WIDMER, DONNA ANN HITT
BROOKS, AND ROBERT DREW HITT

| | |
|---|---|
| DATE OF JUDGMENT: | 08/17/2020 |
| TRIAL JUDGE: | HON. RODNEY PURVIS FAVER |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | WILLIAM PAUL STARKS II |
| ATTORNEY FOR APPELLEES: | CHRISTOPHER D. HEMPHILL |
| NATURE OF THE CASE: | CIVIL - WILLS, TRUSTS, AND ESTATES |
| DISPOSITION: | AFFIRMED - 05/03/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**BARNES, C.J., FOR THE COURT:**

¶1. Dr. Anita Virginia Rish Hitt (Ginger) died testate on April 12, 2017, and was survived by three natural children—Charlotte Hart, Sheron Dunn, and Yvonne Widmer—and two stepchildren—Robert Drew Hitt (Drew) and Donna Ann Hitt Brooks (Ann).[1] Charlotte filed a "Petition for Probate of Will and Other Relief" with the Lowndes County Chancery Court, seeking to admit a last will and testament signed by Ginger and dated November 1, 2006

---

[1] Another stepchild, James Hitt, predeceased Ginger.

(2006 Will).[2] Sheron subsequently filed a petition seeking to admit a last will and testament signed by Ginger on January 19, 2015 (2015 Will), which left her entire estate to Sheron. Charlotte, Yvonne, Drew, and Ann (the Appellees) contested the 2015 Will, arguing (1) undue influence, (2) fraud and misrepresentation, (3) the existence of a confidential relationship, and (4) Ginger's lack of mental capacity.

¶2.     After a bench trial, the chancery court concluded that although Ginger had the mental capacity to execute the 2015 Will, Sheron failed to rebut the presumption of undue influence over Ginger. Therefore, the court dismissed the petition to probate the 2015 Will. Sheron appeals from that judgment. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3.     Ginger, a retired college professor, had three natural children—Sheron, Charlotte, and Yvonne—from her marriage to her deceased first husband. She also had three stepchildren from her second marriage to Dr. Ralph Hitt—Drew, Ann, and James. When Ralph died in 2011, Ginger owned two residences—a primary residence in Columbus, Mississippi, and a farmhouse in Chickasaw County. Not wanting to live alone, Ginger decided to reside with Sheron in Jackson, Tennessee, visiting Charlotte and Yvonne on occasion. Due to failing eyesight, Ginger became reliant on Sheron to drive her to appointments, and Sheron would

---

[2] The 2006 Will appointed Charlotte as Ginger's executor and devised Ginger's property interest in the farmhouse in Chickasaw County to her three daughters. Her home in Columbus, since her husband had predeceased her, was equally divided, per stirpes, to all five children in equal shares. The 2006 Will further split any proceeds from the sale of her vehicle to the five children. Because the residuary legatee (her husband) had predeceased her, the residuary estate presumably would be inherited by her heirs-at-law, which is not an issue before us on appeal.

frequently take Ginger to spend weekends at the farmhouse.

¶4.     In January 2014, Ginger had major heart surgery, after which she "experienced post-surgical delirium and confusion." She soon recuperated and was discharged to Sheron's care on February 9, 2014. A month later, a bank officer alerted Charlotte to suspicious banking activity with Ginger's Cadence Bank checking account; both Charlotte and Sheron were listed as co-owners on the account. After reviewing bank statements, Charlotte became concerned about several ATM withdrawals and purchases made in Florida, Tennessee, and Mississippi during Ginger's hospital stay and while Ginger had been visiting Charlotte in Ohio. The Appellees attempted to meet with Ginger and Sheron to discuss the banking issues but were unsuccessful; so upon advice from a bank representative, Charlotte withdrew $160,000 from the checking account (without notice to Ginger or Sheron), leaving approximately $20,000 in the account.

¶5.     On April 10, 2014, Charlotte and Yvonne filed a petition for conservatorship with the chancery court and interpled the $160,000 in funds with the chancery clerk. Ginger retained the services of attorney Tim Hudson to defend the conservatorship action. The chancery court ordered a licensed neuropsychologist, Dr. Brian Thomas, to examine Ginger; the examination took place on August 30, 2014. After reviewing her medical history and results from prior neuropsychological examinations, Dr. Thomas reported that Ginger "appears to be demented and have very poor insight into her cognitive difficulties" and "does appear at heightened susceptibly to influence or deception by others." His report concluded that Ginger "would likely have great difficulty managing her finances due to difficulty keeping

3

track of information about her finances and forgetfulness of information about her finances that she had previously learned."

¶6. On January 12, 2015, "in order to avoid further expense and prevent further erosion of the family relationship," an agreed order for a partial conservatorship over Ginger's finances was entered, appointing the chancery clerk as the conservator. Ginger was still allowed complete discretion over her Cadence Bank checking account, into which her monthly retirements benefits were deposited and from which monthly expenses were deducted.

¶7. After Ginger died testate in April 2017, Charlotte filed a petition to probate Ginger's 2006 Will. On May 9, 2017, Sheron filed a petition to probate the 2015 Will, which had been executed a week after the conservatorship settlement and which left Ginger's entire estate to Sheron.

¶8. Contesting Sheron's petition, the Appellees asserted that Ginger did not have the mental capacity to execute the will and that the will "was procured by undue influence, fraud and misrepresentations by Sheron[.]" The Appellees claimed that Sheron had "secluded" Ginger from them since the conservatorship, "block[ing] cell phone communication, prohibit[ing] phone calls and visits, and threaten[ing] criminal charges if family tried to visit or call[.]" A bench trial was held on February 12-13, 2020. The parties stipulated that the 2015 Will was validly executed[3] and that a confidential relationship existed between Ginger and Sheron.

---

[3] Although the dissent spends several paragraphs addressing Ginger's mental capacity to execute the will, no one has disputed that the will was validly executed.

4

¶9. Hudson, Ginger's attorney, testified that Ginger had met with him several times and was "mad" about the conservatorship. He stated that Ginger had agreed to the conservatorship because "she was tired of going through all of this and wanted this over with." Hudson "never made any decision or carried out anything at the direction of Sheron Dunn." Although he admitted that Sheron "was usually present" during the conservatorship discussions, "she was never present" during the meetings regarding the 2015 Will. Hudson further testified, "At no time that I dealt with [Ginger] did I ever believe that she was of unsound mind. Whether she was influenced or not; not in my presence, but I wanted to go over that and stress that with her."

¶10. Prior to the execution of the 2015 Will, Hudson interviewed Ginger; this interview was videotaped by his daughter and associate, Collen Hudson. This video was entered into evidence. In the video, Hudson asked Ginger several questions to determine her capacity. She acknowledged that she had "hospital-induced delirium" following her heart surgery and that doctors had diagnosed her with "early on-set dementia," but she did not agree that she needed a conservatorship. She only agreed to the conservatorship because she "wanted this over with." Although Ginger acknowledged that Sheron had driven her to the attorney's office, she insisted that Sheron was not present during her meetings with Hudson regarding the 2015 Will; nor had Sheron pressured or coerced her to change her will. Ginger reasoned that Charlotte and Yvonne had already received their part of the estate since she had to pay their attorney's fees in the conservatorship proceeding. Ginger confirmed that she wanted Sheron to act as her executor and that Hudson and Collen were the only persons in the room

5

besides herself.

¶11.    Hudson had sent two letters to the Appellees' attorney, which were entered into evidence.  The first letter, dated June 23, 2015, stated in part, "It is my understanding from my client that she does not want any contact with the daughters who filed the lawsuit.  It appears this matter is now adversely impacting [Ginger's] health. . . . [Ginger] has asked that I contact her daughters through you and inquire if they would be agreeable to dissolving the conservatorship."  Hudson sent a second letter two weeks later, advising the Appellees that Ginger considered their calls "to be harassment and she has stated she will file criminal charges if they continue. . . . [Ginger] will advise them when she is ready to speak with them."

¶12.    Deposition testimony (from September 2018) by Ginger's treating physician, Dr. Kelly Wallace-Wilding, was entered into evidence.  Dr. Wallace-Wilding testified that she began treating Ginger in December 2013.  She conducted a "mini mental status exam" of Ginger in April 2014, and Ginger "scored a thirty out of thirty."  Ginger also passed another mental mini-status examination in September 2014.  At Ginger's request, Dr. Wallace-Wilding arranged for Dr. Michael Anton, a neuropsychologist, to perform an independent evaluation.  Dr. Anton conducted two evaluations: one in February 2014 and one in September 2014.[4]  In the September evaluation, Dr. Anton's "overall impression [was] one of progressive dementia of mild to moderate severity," and he "believe[d] that [Ginger] is

_____

[4] The February 2014 evaluation is not in the record, but it is referred to in Dr. Wallace-Wilding's testimony and Dr. Thomas's report, which noted, "An impression of generally and moderately abnormal neurocognitive examination . . . [and] probable progressive dementia."

6

well served by assistance in important affairs of daily living and she is receiving at least minimal assistance, as required, from her daughter, with whom she lives."

¶13.    Emily Atkinson, a personal friend of Ginger's, testified that she spoke or visited with Ginger on a regular basis. She said Ginger had shown her "the video of her last will" and had told Atkinson "that's what she wanted to do, and that came out of just how she had been made to feel." Emily also said she "pit[ied] the person that would try" to coerce Ginger into changing her will. When asked if she believed "Sheron was isolating [Ginger] from anyone," Atkinson responded, "No. Unh-unh. (No)." Emily claimed that Sheron had even offered to take Ginger to see the other children, but Ginger "didn't want to." She recalled one instance when Charlotte called her mother, but Ginger put the phone down and "didn't want to talk to them because Charlotte made her feel feeble-minded."

¶14.    Sheron testified that Ginger paid her $2,000 a month to help take care of Ginger and take her to the farm regularly. She also confirmed that Ginger had executed a power of attorney in her name in February 2014 and that she had driven Ginger to Hudson's office. However, Sheron said she never used the power of attorney to sign checks or suggested that her mother change or revoke a will to exclude the Appellees. Sheron testified, "She was my boss. I was not hers."

¶15.    Sheron also denied that she kept Ginger from seeing family and friends. A video from November 2015, recorded by Sheron's son, was played and admitted into evidence. The video depicted the Appellees on the porch of the farmhouse talking to Ginger, who was agitated and still "very angry" about the conservatorship proceedings. Ginger said she would

7

only forgive the Appellees if they got "on their knees and apologize[d] to [her]." Charlotte and Yvonne were very emotional, telling their mother that they loved her and that the filing for conservatorship was done to protect her. After approximately thirty minutes of discussion, the Appellees left.

¶16. The Appellees moved for an involuntary dismissal, which the chancery court denied. Martha Bradberry, Ginger's first cousin, testified that she lived near Ginger's farmhouse and visited with her "almost every weekend." Martha said that Ginger "couldn't understand" why the conservatorship had been filed and that Ginger said Sheron "was telling her that her other daughters were trying to control her." Martha heard Sheron say "more than once" that her siblings "were trying to take [Ginger's] money." Martha also said Sheron "would encourage Ginger to think about what she was saying because if she didn't get it right, that Sherry could possibly go to jail."[5] These conversations occurred prior to the conservatorship hearing.

¶17. Martha testified that both before and after a discussion of the 2015 Will, Ginger had said that "she really would like to leave to all three girls," but Sheron had told Ginger that she "needed to do" a new will. Martha also claimed Ginger had a "folded" typewritten paper that she "was to read during the video" taken by the attorney. Martha saw Ginger with the paper on "two different visits." Martha further testified that Ginger "was afraid of what Sherry would say" with regard to the conservatorship and "would tell Sherry, okay, I'll say what you want me to say." On another occasion when Sheron was out of town, Martha took

_____

[5] Several witnesses referred to Sheron as "Sherry."

Ginger to the bank to get a copy of her bank statement, and Ginger "started crying because she said, I have only got $1,500 . . . [a]nd . . . I don't know what happened to my money." Martha testified, "Sherry had complete control. Nobody could talk to Ginger unless you went through Sherry." As a rebuttal witness, Sheron disputed this testimony, claiming that she never prevented Martha from visiting with Ginger when she was not around.

¶18. In August 2016, Martha encountered Ginger walking down the road in her nightgown. She said Ginger "was confused," so Martha picked her up, and she stayed with Martha for three to four days. Martha said that one morning while staying with her, Ginger began crying and "said that she had no life, she never got to talk to anybody or see anybody other than Sherry[.]" Also during that time, the Department of Health and Human Services (DHS) visited the farmhouse; Sheron was staying in a trailer on the property. Martha said that the condition of the home was "dirty" and that there was no food; Sheron claimed that the house had been sprayed for fleas. Martha also testified that Ginger had a cell phone but that the phone had no service so she could not make any calls. Martha initiated a call to Charlotte and Yvonne, and she said Ginger seemed happy to talk to them. Martha never confronted Sheron because she was "scared of Sherry, too." Martha noted that in August 2016, Sheron was at Martha's house and became "very emotional and upset, and she said that she was broke, she had no money and that what her sisters, Charlotte and Yvonne, wanted was to break her."

¶19. On cross-examination, Martha admitted that she "just assumed Sherry" had written the typewritten paper and that she was not actually aware of what Ginger took to Hudson's

9

office when taping the video.[6] Martha acknowledged that Ginger was a "strong-willed person" and stated that she, Martha, "like[d] Sherry." When asked about Sherry's staying in the trailer on the farm property, Martha stated, "I think there was some conflict. Ginger said that [she] and Sherry had words." Martha admitted that the DHS investigation found no signs of abuse.

¶20. Anna Alford, a distant relative of Ginger's who lived in close proximity to the farmhouse, testified that after the conservatorship, she did not visit with Ginger as often as in the past because it was "just not a comfortable environment." Anna said that no one ever told her not to visit, but she "could never talk to [Ginger] like I had always talked to her" because Sheron was always there. Ginger would tell Anna that Charlotte and the other siblings "stole her money," and Anna and Sheron would "correct her and explain" that they merely moved her money, but Ginger did not seem to understand.

¶21. In May 2015, Anna saw Ginger standing barefoot in the yard, so Anna took Ginger to Anna's home. Ginger said she wished she could stay with Anna, but "they won't let me," referring to Sheron. Anna testified that the last time she saw Ginger, her cell phone was not working (had no signal), so she called Charlotte and said Ginger "was very glad to talk to [her]." After also witnessing Ginger walking down the road in her nightgown while on Anna's way to work, she contacted Martha's husband to check on Ginger. Anna's reason for not contacting Sheron directly was because Ginger told Anna that Sheron did not like her. On cross-examination, Anna admitted she never heard Sheron tell Ginger she needed to make

[6] The video did not depict Ginger holding any paper.

a new will.

¶22.    Francis Brown, Ginger's long-time friend and next-door neighbor in Columbus, testified that right before Ginger moved in with Sheron, she "didn't ever get to see her by herself" because Sheron "was always right by her side . . . [and] would run out and come to the porch."  Francis never discussed the conservatorship with Ginger; she only knew what Charlotte had told her.  Francis stated that Ginger told her, "Sherry is so jealous of Yvonne and Charlotte, and . . . it is really causing problems."  Ginger also told Francis that the three girls would inherit the farm one day.  Francis testified that Sheron's son, Phillip, had let a friend live in Ginger's Columbus home and that the friend was a habitual drug user.  When Ginger and Sheron's family went on a beach trip, Sheron asked Francis, "[P]lease don't tell [the other siblings] that we're going to the beach[;] it upsets Mother so much when they stalk her and try to come wherever we are."  Francis agreed that Ginger was an "opinionated" and "strong-willed" person, but she also said that "there were several visits there towards the end that she was a bit confused."

¶23.    Ginger's deposition, taken in 2014, was read in open court.   Discussing the conservatorship proceedings, Ginger replied:

> I don't know how many years I have got left of the 78 I have already used up, but I want to be in charge as long as I can.  And I have been through the agonies of hell for the last seven months because I can't get to my money.  Now, that is insulting and belittling.  The name of the book I'm writing is Big, Huge and In Charge, if that tells you anything.  I want to manage any [sic] own affairs.

However, although Ginger admitted that she had given Phillip a debit card and allowed him to use it on occasion, when asked whether she had let him use the debit card at Bass Pro

11

Shops (for over $500), she replied, "I probably have. I don't know. I don't remember. I don't keep records of all of this." Ginger also did not know who had made ATM withdrawals of $800 while she was in the hospital for her heart surgery. She further had no idea that over $15,000 had been withdrawn from her checking account in February 2014.

¶24. Charlotte testified that when her mother was diagnosed with breast cancer in 2012, she put Charlotte and Sheron on her checking account. Charlotte would talk to her mother every day, and Ginger stayed with Charlotte in Ohio for twenty-three days in November 2013. When Ginger was in the hospital for heart surgery from January 27 to February 4, 2015, Charlotte stayed with her; Sheron only "came during visiting hours." Charlotte and Yvonne visited Ginger after she was released and living with Sheron. She said that her mother had given her a copy of the 2006 Will in March 2014.

¶25. Ginger became "obsessed" about getting her tax return filed, so Charlotte contacted Cadence Bank to obtain her bank records. It was then that the bank officer alerted Charlotte that "the spending habits had changed dramatically," and Charlotte discovered that there were "tens of thousands of dollars were going to other places." Alarmed, Charlotte contacted Yvonne, Drew, and Ann. She testified, "We tried several times to talk to Mom, me and Sherry, about it. But we were never successful at having a meeting over it." Upon the advice from a bank officer, Charlotte moved $160,000 from the Cadence Bank checking account to another account.

¶26. After Charlotte filed for the conservatorship, she attempted to call her mother almost daily, but her mother quit answering her calls. Charlotte testified, "I mean, it was clear that

12

the phone was not connected and she was not going to have it. Every telephone in every house was gone. The locks were changed. It was very clear to me that I was not going to be able to speak to my mother." Texts from Sheron to Charlotte dated April 27, 2014, and May 20, 2014, were entered into evidence. In those texts, Sheron threatened to press charges if Charlotte continued to call any phone under Sheron's cellular plan. Charlotte asserted that from August 2014 to November 2015, she "was not allowed to see [Ginger]." Charlotte kept in touch with Francis, Anna, and Martha to check on her mother's health. Charlotte and other family visited Ginger at the farmhouse in November 2015, as indicated in the video. The last time Charlotte spoke with her mother was in August 2016 when either Anna or Martha called her, and Ginger spoke to her then. After Ginger died, Charlotte was notified two days afterward when she received a phone call from someone in Hudson's office.

¶27. On August 17, 2020, the chancery court issued its opinion and final judgment. Based on the evidence of "Dr. Thomas's August 30, 2014 evaluation; the fact that Ginger was appointed a conservator; the suspicious circumstances regarding Ginger's isolation; Ginger's total dependence on Sheron; Sheron's constant presence; and Martha's testimony regarding Sheron's instigation and participation in bringing about the new will," the court concluded that Sheron had not overcome the presumption of undue influence by clear and convincing evidence. The chancery court thereby dismissed the petition to probate the 2015 Will. Sheron filed a motion for a new trial or, in the alternative, to alter or amend the judgment, which the chancery court denied. Aggrieved, Sheron appeals.

**STANDARD OF REVIEW**

13

¶28.    Our review of a chancery court's ruling is limited.  *O'Brien v. Pegues*, 325 So. 3d 1228, 1233 (¶11) (Miss. Ct. App. 2021).  "[T]he factual findings of the chancery court, if supported by substantial evidence, will not be disturbed unless the chancery court abused its discretion, applied an erroneous legal standard, or its findings are manifestly wrong or clearly erroneous."  *Id*. (quoting *Rucker v. Miss. Dep't of Revenue*, 281 So. 3d 253, 254 (¶6) (Miss. Ct. App. 2019)).  "However, questions of law receive a de novo review."  *Id*.

**DISCUSSION**

¶29.    Sheron contends that the chancery court erred in finding (1) that a presumption of undue influence arose and (2) that Sheron had failed to rebut that presumption.  Sheron acknowledges the parties stipulated that a confidential relationship existed between Sheron and Ginger, which raised the presumption of undue influence.  *See Stover v. Davis*, 268 So. 3d 559, 563 (¶12) (Miss. 2019) (holding a will contestant "raises a presumption of undue influence by showing the existence of a confidential relationship between the testator and a beneficiary under the will).  But she argues that the Appellees were further required to "produce evidence of an abuse of that relationship relating to the execution of the will."  In *In re Est. of Rogers*, 270 So. 3d 1, 12 (¶39) (Miss. Ct. App. 2018), this Court indeed held that "[i]n a will contest, a confidential relationship alone does not give rise to the presumption.  Rather, 'there must also be an abuse of that relationship relating to the execution of the will.'" (Quoting *Costello v. Hall*, 506 So. 2d 293, 298 (Miss. 1987)).

¶30.    As the chancery court recognized:

> [A]lthough the mere existence of confidential relations between a testator and
> a beneficiary under his will does not raise a presumption that the beneficiary

14

exercised undue influence over the testator, . . . such consequence follows where the beneficiary 'has been actively concerned in some way with the preparation or execution of the will, or where the relationship is coupled with some suspicious circumstances, *such as mental infirmity of the testator;' or where the beneficiary in the confidential relation was active directly in preparing the will or procuring its execution, and obtained under it a substantial benefit.*

*Croft v. Alder*, 237 Miss. 713, 723-24, 115 So. 2d 683, 686 (1959) (emphasis added) (quoting 57 Am. Jur. *Wills* § 389, at 380 (1948)); *see also Davion v. Williams*, 352 So. 2d 804, 805 (Miss. 1977) (holding that "the presumption of undue influence requires proof of a confidential relationship and suspicious circumstance in the execution of a Will"). The chancery court concluded that (1) the conservatorship; (2) Martha's testimony; (3) "the extent to which Sheron benefit[ted] from the will"; (4) Sheron's driving Ginger to the attorney's office; and (5) "Charlotte's proof that Sheron isolated Ginger" constituted "suspicious circumstances" in this instance. We find the court's ruling is supported by the record.

¶31. Martha testified that she heard Sheron and Ginger discussing making a new will:

Q.      . . . What did that have to do with the last will –

A.      Oh, with the last will?

Q.      Yes, ma'am.

A.      Okay. Sherry explained to Ginger that they needed to do a video will and that in that new video will, that Ginger would leave everything to Sherry.

Q.      You specifically heard Sherry tell, You will leave everything to me?

A.      Um-hmm. (Yes). Yes.

Q.      Okay. Did you ever hear that more than once?

15

A. Yes, maybe twice.

Q. All right. Did [Ginger] ever talk to you, out of Sherry's presence, about doing any will?

A. Yes.

Q. What did she say?

A. She said that she really had – she really would like to leave to all three girls.

Q. Okay. And do you know what became of that? . . . Was that after she had already been mentioned about her doing the new will?

A. Yes. Yes, before and after.

Q. Okay. That she wanted to leave everything to all three girls?

A. Yes.

Martha also saw Ginger on two occasions with a piece of paper that Ginger said "she was to read during the video." Although Sheron unequivocally denied having any influence over her mother's decision to execute the 2015 Will, the chancery court found Martha's testimony regarding Sheron's participation in preparing the will to be "extremely credible."

¶32. Sheron claims Martha's testimony was "unsupported and erroneous," demonstrating a bias against Sheron. However, Anna's testimony corroborated some of Martha's testimony, noting that Ginger's cell phone was not in service and that she had also witnessed Ginger walking down the road in her nightgown in 2016. Francis also corroborated Martha's testimony that Ginger had expressed an intent to leave her property to all of the children. Regarding any bias, Martha said that she "like[d] Sherry," although she admitted she "was afraid" of her. As noted, Charlotte testified that the Appellees' attempts to talk to Ginger

16

from April 2014 to November 2015 were unsuccessful, supporting the court's finding that Sheron "isolated Ginger." Again, Martha and Anna both noted that Ginger's cell phone did not have service.

¶33. It was undisputed that Ginger relied on Sheron to take her to appointments, including her trips to the attorney's office. Sheron correctly asserts that her merely driving Ginger to the attorney was "not enough to prove a presumption of undue influence." *See Chapman v. Chapman (In re Est. of Chapman)*, 966 So. 2d 1262, 1265 (¶17) (Miss. Ct. App. 2007) (finding no presumption of undue influence when wife's "only action[s] involving the will were traveling with [her husband] to his attorney's office and possibly discussing it with [him]"). However, as enumerated above, this was but one of several factors cited by the court in making its determination. Moreover, Hudson testified that "Sheron ha[d] called [him] several times and relayed concerns that [Ginger] had, but [he] always would talk to [Ginger], [him]self." Before the conservatorship, Hudson had represented Sheron's son Phillip in a criminal misdemeanor proceeding and had represented Sheron in a custody case between Sheron and her ex-husband. Hudson also filed an answer and signed the agreed order on behalf of both Sheron and Ginger in the prior conservatorship proceeding.

¶34. "In those instances where there is a conflict in the evidence, it is the chancellor's duty, sitting as the fact-finder, to assess the evidence and determine what weight and worth to give it." *Chaney v. Chaney (In re Est. of Chaney)*, 235 So. 3d 120, 122 (¶7) (Miss. Ct. App. 2017) (quoting *Hinders v. Hinders*, 828 So. 2d 1235, 1244 (¶28) (Miss. 2002)). Therefore, if substantial evidence the chancellor found credible supports the chancellor's ruling, "this

17

court may not intercede simply to substitute our collective opinion for that of the chancellor." *Id.* Based on the foregoing discussion, we find there was substantial evidence to support the chancellor's determination that a presumption of undue influence was raised.

¶35. Sheron further contends that the chancery court erred in finding that she failed to overcome the presumption of undue influence by clear and convincing evidence. "When a presumption of undue influence arises, then the proponent of the will bears the burden to rebut the presumption with clear and convincing evidence that the will was not the result of undue influence." *Stover*, 268 So. 3d at 563 (¶12). The supreme court further held:

> To rebut the presumption, the proponent must show three things: "(a) good faith on the part of the beneficiary, (b) the testatrix's full knowledge and deliberation of the consequences of her actions, and (c) the testatrix received the advice of a competent person disconnected from the beneficiary and devoted wholly to [her]."

*Id.* (quoting *In re Est. of Dabney*, 740 So. 2d 915, 921 (¶19) (Miss. 1999)).

### A. Good Faith on the Part of the Beneficiary

¶36. The chancery court thoroughly considered the following factors in determining whether Sheron, the beneficiary, acted in good faith:

> (a) determination of the identity of the initiating party in seeking preparation of the instrument, (b) the place of the execution of the instrument and in whose presence, (c) what consideration and fee were paid, if any, and (d) by whom paid, and (e) the secrecy and openness given the execution of an instrument.

*Mullins v. Ratcliff*, 515 So. 2d 1183, 1195 (Miss. 1987) (citing *Murray v. Laird*, 446 So. 2d 575, 578 (Miss. 1984)). The court acknowledged Hudson's testimony that Ginger "initiated the preparation" of her 2015 Will shortly after the conservatorship and Sheron's testimony that she was not at Hudson's office when the video was made regarding the will, although

18

she had driven Ginger there. Hudson said he never discussed Ginger's will with Sheron, and Ginger's 2015 Will was executed in his office in the presence of only himself and Collen, his daughter/associate. Hudson testified that he and his daughter knew they were witnessing Ginger's will. *See Smith v. Streater (In re Est. of Smith)*, 827 So. 2d 673, 680, 684 (¶¶4-5) (Miss. 2002) (affirming chancellor's finding "that all that is required to overcome the secrecy issue is to show that the witnesses knew that a will was being executed"). The court further observed "that there was no testimony offered"—aside from the attorney's advising Ginger not to discuss changes to the will with anyone—"regarding the secrecy of the given execution of the will." Sheron asserted that she did not pay for the will, so the chancery court found it was "a reasonable assumption . . . that Ginger paid for the will's preparation," as she had also paid the attorney's fees associated with the conservatorship.

¶37. Nevertheless, citing Martha's "extremely credible" testimony that she had heard Sheron and Ginger discussing the preparation of the 2015 Will and "that Ginger would leave everything to Sheron," the chancery court was "not convinced by clear and convincing evidence that Sheron had nothing to do with the initiation of the preparation of the will." As already addressed, where the record contains substantial evidence "found credible by the chancellor" to support the chancellor's ruling, we will not "substitute our collective opinion for that of the chancellor." *In re Est. of Chaney*, 235 So. 3d at 122 (¶7). In addition to Martha's "credible" testimony, there was also evidence that the Appellees had tried to meet to discuss Ginger's finances before initiating the conservatorship proceedings but had been

unable to talk with Ginger, presumably due to Sheron's influence.[7] Although Sheron insisted that Ginger did not want to talk to the Appellees, both Martha and Anna contacted them for Ginger during a visit, and Ginger spoke to them on those two occasions. We therefore find no error in the court's holding.

B. *Ginger's Knowledge and Appreciation of the Consequences of her Actions*

¶38. As the chancery court recognized, several factors are to be considered in determining a testator's knowledge in executing a will. These factors are:

> (a) her awareness of her total assets and their general value, (b) an understanding by her of the persons who would be the natural inheritors of her bounty under the laws of descent and distribution or under a prior will and how the proposed change would legally affect that prior will or natural distribution, (c) whether non-relative beneficiaries would be excluded or included and, (d) knowledge of who controls her finances and business and by what method, and if controlled by another, how dependent is the grantor/testator on her and how susceptible to her influence.

*Hart v. Steverson (In re Est. of Hart)*, 20 So. 3d 748, 755 (¶18) (Miss. Ct. App. 2009) (quoting *Holmes v. Holmes-Price*, 961 So. 2d 674, 684 (¶39) (Miss. 2007)). After consideration of these factors, the court concluded that "while Ginger did have full knowledge of her total assets," Sheron failed to demonstrate "by clear and convincing evidence that Ginger was able to deliberate her actions and their consequences" when executing the will "because she was heavily influenced by Sheron and Sheron's constant presence."

---

[7] The Appellees also note in their brief that they only learned of Ginger's death through Hudson, and it was three years before they learned "the whereabouts of their mother's remains."

¶39. In the video, Ginger clearly knew who her heirs were and was aware that the majority of her finances were subject to the conservatorship. Hudson testified that Ginger knowingly disinherited all heirs, except for Sheron, due to her anger over the conservatorship proceedings. However, it was disputed whether Ginger was aware of precisely how much land she owned. In the video taken before the execution of the 2015 Will, Ginger stated that she owned a house and "roughly 100" acres, but the land was actually 350 acres.

¶40. Charlotte claimed that Ginger's actions in disinheriting the Appellees were prompted by Sheron's isolating Ginger from the other family members and influencing her decisions about money. Sheron acknowledged that Ginger paid her $2,000 a month to take care of her. As the chancery court observed, it was "suspicious that Sheron quit her full-time teaching job at Ginger's suggestion and not her own."

¶41. The court also noted Martha's testimony that Sheron would say things to Ginger about the money "to make her angry again." Martha also said Ginger became upset on one occasion when Sheron was out of town because Ginger did not understand where her money had gone. Lastly, Martha opined that Sheron had prepared the typewritten paper for Ginger to memorize in preparing for the video at the attorney's office. As Sheron observes in her brief, the chancery court acknowledged that neither Martha, Anna, nor Francis had expressed any concerns regarding Sheron's behavior until after Ginger's death and the lawsuits were filed. The court, however, made additional findings that "both Martha and [Anna] testified to Sheron's seemingly omnipresence prior to Ginger's death, and Martha even indicated she was 'mentally' afraid of Sheron despite liking her as a friend."

¶42. We find no error in the chancery court's finding that Ginger's ability to "deliberate her actions and their consequences" was "heavily influenced" by "Sheron's constant presence."

### C.     Independent Consent and Action

¶43. As this Court has recognized, "the best way to show independent consent and action is to provide advice of (a) a competent person, (b) disconnected from the grantee, and (c) devoted wholly to the grantor/testator's interests." *In re Smith*, 170 So. 3d 530, 539 (¶28) (Miss. Ct. App. 2014) (quoting *Howell v. May*, 983 So. 2d 313, 320 (¶25) (Miss. Ct. App. 2007)). Hudson testified that he took all his direction from Ginger in drafting the 2015 Will, and the chancery court determined that there was "no credible proof presented that indicated Hudson prepared the 2015 [Will] at the direction of Sheron." Hudson even testified that he had advised Ginger "to take some time and think about it." Thus, Sheron argues that this prong was satisfied simply by Ginger's receiving advice from Hudson, the attorney for the conservatorship.

¶44. The dissent would have us end our analysis here, ignoring the chancellor's conclusion, as the trier of fact, that there was also "credible proof," i.e, Martha's testimony, "that it was Sheron who prompted and influenced Ginger to seek out Hudson to prepare a new will." As the supreme court has held, "the participation of the beneficiary/grantee, . . . arouses suspicious circumstances that negate independent action." *Wright v. Roberts*, 797 So. 2d 992, 1002 (¶37) (Miss. 2001) (quoting *Harris v. Sellers*, 446 So. 2d 1012, 1015 (Miss. 1984)). In *Wright*, the supreme court found the beneficiary had "failed to prove by clear and

convincing evidence that [the grantor] exhibited independent consent and action," citing as one factor the lack of proof that the grantors had spoken "with any other attorney independent of" the beneficiaries' attorney and that the beneficiaries had used the attorney "extensively." *Id*. at 1002-03 (¶¶39, 41). Here, there is undisputed evidence that Hudson had previously represented both Phillip and Sheron before the proceedings in question. Also, while Hudson did attempt to ensure that he was following Ginger's wishes in executing the 2015 Will, there is no indication that he was aware of the pressure and isolation Ginger was experiencing as a result of Sheron's actions outside his presence.

¶45.    As this Court noted in *In re Est. of Rogers*, "good faith, knowledge and deliberation, and independent consent and action 'are not independent requirements to be rigidly exacted in every case, but rather are indicia of the real question: whether the will was the product of undue influence.'" *In re Est. of Rogers*, 270 So. 3d at 13 (¶41) (quoting Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 8:18 (3d ed. 2003)). We find that the chancery court's holding that Sheron failed to rebut the presumption of undue influence by clear and convincing evidence is supported by substantial evidence.

## CONCLUSION

¶46.    Accordingly, we find that the court did not err in dismissing the petition to probate the 2015 Will and affirm the judgment.

¶47.    **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, SMITH AND EMFINGER, JJ., CONCUR. McCARTY, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, J.**

23

**McCARTY, J., DISSENTING:**

¶48.    Because even the trial court concluded "[t]here was no credible proof presented" that Dr. Hitt's 2015 will was prepared "at the direction of Sheron," her daughter, it was reversible error to reject the will from probate.  The doctor treating Dr. Hitt, the lawyer who prepared the 2015 will, and *even Dr. Hitt herself in a videotaped interview*, all explained how she was furious at her daughters Charlotte and Yvonne for forcing her into a conservatorship.

 ¶49.    The trial court repeatedly found these witnesses credible yet somehow arrived at the opposite end of the spectrum, concluding the will was the product of undue influence.  The evidence at trial, and even the trial court's own order and findings of fact, simply do not support this conclusion.  A closer look at the testimony in this case underscores why there was no undue influence in the 2015 will, and why it should have been admitted to probate.

¶50.    The match which ignited the wildfire in this family was one moment in 2014, and this moment is undisputed.  As the trial court found in its order, Dr. Hitt's daughter "Charlotte stated she withdrew $160,000.00 from [her mother's] Cadence Bank checking account and deposited the same in a new account under her name only."  While Charlotte said she did it to protect her mother from people taking her money, she did it without consulting her mother.  By all accounts, this left her mother furious and upset.

¶51.    Charlotte then instituted a conservatorship, which forced her mother into a legal proceeding, resulting in nearly $30,000 drawn off the $160,000 to pay for various legal fees.  This covered the fees for Charlotte, in pushing for the conservatorship—and her mother, in fighting it.

¶52.    Again, the beginning to this story is undisputed.

**_Dr. Hitt's lawyer testifies she was "absolutely not" influenced._**

¶53.    The first witness called during the will contest was Timothy Hudson, a lawyer with over thirty years of experience.  During that time, Hudson had prepared "several hundred" wills and likewise prepared the disputed 2015 will for Dr. Hitt.  The lawyer and his client had "met many times," and he had represented her in the conservatorship proceedings.  According to the lawyer—and the language of the agreed order ending the legal battle—she never consented that she lacked the ability to manage her own affairs.  Rather, she wanted to stop the dispute to end the cost to her and the intra-family fighting.

¶54.    Hudson explained that Dr. Hitt was "mad" about the conservatorship proceedings Charlotte had forced her into.  "She was highly upset about what she would refer to as, this is my money, I have worked hard for it, and I don't want anybody telling me what I can do with my money," he recounted her saying.  "And she was -- [a] dozen times, that that was discussed."

¶55.    In sum, Dr. Hitt was mad about Charlotte taking her money and forcing her into a conservatorship, so she asked Hudson to prepare her a will.  The lawyer didn't testify that it was Dr. Hitt _and_ Sheron who asked him about a will—it was the mother alone.  It was just Dr. Hitt, Hudson, and Hudson's daughter (also an attorney) who met.  And when Dr. Hitt's 2015 will was executed, the two subscribing witnesses were just those two—her lawyer and his lawyer daughter.

¶56.    The lawyer was careful about the execution of the 2015 will—even videotaping a

25

consultation with Dr. Hitt. He had also intentionally slowed down the process because Dr. Hitt wanted to cut her other daughters completely out of her will. Between the agreed order resolving the battle over the conservatorship and drafting the new will, Hudson built in a week-long cooling-off period.

¶57. The attorney testified he had "probably two reasons" for the time out. "As I said earlier, Dr. Hitt was very upset," he recalled. "The term 'mad' would be the most accurate way to put it," so he wanted to make sure she didn't do anything rash to her children as revenge for the conservatorship. Secondly, the lawyer knew that cutting out the other daughters would likely result in litigation, so he "wanted to make arrangements to video it, where I could go over things and not have to trust my memory."

¶58. "Dr. Hitt did tell me she doesn't want to have contact with her children," the lawyer explained when asked about how the mother had cut Charlotte out of her life. "And I talked to Dr. Hitt about [that]; they're your family and, you know, they're probably concerned. And she told me she would let me know when she was ready to talk with them."

¶59. When asked about Dr. Hitt's mental status, the lawyer was adamant: "At no time that I dealt with Dr. Hitt did I ever believe that she was of unsound mind." Nor was she influenced "in [his] presence[.]" The lawyer doubled down in his testimony that "there was never, at any time, any doubt in my mind concerning her mental soundness[.]"

¶60. Questioned if he had any reservation about Dr. Hitt's testamentary capacity, Hudson replied, "I have never seen any evidence that she was not mentally competent to make decisions." In his view, this was established that he had "talked to her at length" regarding

26

the conservatorship dispute and the will. If he hadn't believed Dr. Hitt had mental capacity, the lawyer testified he wouldn't have prepared the will. "But she made it clear that she was mad at the children, they were trying to place her under a conservatorship and that they were going to regret that they did this," the lawyer testified. "And that was probably from the very beginning and continued throughout. She was offended."

¶61. Under oath, Hudson was asked if Dr. Hitt. was "susceptible to influence." The lawyer responded "Absolutely not. She was . . . a very strong-willed woman," Hudson explained. So strong-willed "that, at times, I tried to diffuse some of this. She didn't listen to me."

¶62. In the end, Hudson was clear: "I never had a question ever about her understanding or competence." "From everything I saw," he swore under oath, Dr. Hitt "was very strong-minded."

### Dr. Hitt's doctor testifies she was not influenced.

¶63. The deposition of Dr. Kellie Wallace-Wilding was read into the record. As a family medicine doctor in Jackson, Tennessee, she had treated Dr. Hitt. She had also prescribed medication for Dr. Hitt for "mild dementia." The doctor explained this "mild stage" as "maybe you might be a little forgetful, like going into a room and forget what you went there for, or have difficulty calling someone's name or an object, but would still be in charge of major things in your life, such as -- even driving would probably be okay with mild dementia, managing your own finances, things like that."

¶64. In 2014 Dr. Hitt had talked to her doctor about what was happening in her family. "[S]he was dealing with a great deal of stress," according to her physician, and "she felt like

that her daughter, Charlotte, was trying to take her away from her daughter, Sheron, who had been caring for her." "And that her daughter, Charlotte, had her name on the checking account and took $160,000 out of her checking at that point. And she's very concerned about this and was trying to protect her assets."

¶65. At the same visit, she told all this to her doctor. The physician did a "mini mental status exam" with Dr. Hitt, to check her cognition. She "scored a 30 out of 30." In the doctor's view, this meant she was capable of making all her own medical and legal decisions. When asked whether "at any time, did she ever seem like that the decisions she was making, as far as medical care, were being influenced by her daughter or by anyone else," the doctor answered, "No."

¶66. In fact, in Dr. Wallace-Wilding's eyes, not only was her patient an independent woman–she liked her daughter Sheron because she did what her mother wanted:

> Oh, she was a firecracker. She was feisty. She would tell you exactly what she thought. And, I mean, I don't know how much she was attached to Sheron, but she liked that Sheron did exactly all the things she liked . . . She wanted somebody to take care of her and do things for her, and she liked that Sheron would, you know . . . do what momma wanted.

So in the doctor's view of Dr. Hitt, "If there was somebody in charge, it was Ms. Hitt. It was not Sheron."

### *The video of Dr. Hitt shows she is composed and not under anyone's influence.*

¶67. The video of Dr. Hitt made by the lawyer prior to signing the 2015 will was played during the trial and admitted into the evidence. Dr. Hitt appears composed, intelligent, and professionally attired. She seems alert and in full control of her faculties. Over the twenty

minutes of the video, she answers in great detail questions about her education, life, health situation, and her work experience, which spanned teaching stints from Tokyo to the Mississippi University for Women. She also spoke extensively about volunteering in Jackson, Tennessee, with a 4-K class, which she did four days a week.

¶68. The answers of the testator were composed and articulate, replete with dates and precision. At one point, Hudson asks her point blank, "has one or more doctors raised the possibility that you're suffering from early onset dementia?" She answered "Yeah, but nobody confirms it." Dr. Hitt said one of her doctors even told her she could live by herself, but that she didn't want to. She also explained that she experienced delirium after a lengthy hospitalization where she admitted she was "pretty much out of it," but that had passed.

¶69. Hudson asked her if she felt she needed a conservator, and she replied, "No, I don't," but that she agreed to one "because I didn't think those children of mine would stop trying to do whatever it was they wanted to do, and I had had a year of it, and I didn't want anymore, I wanted it over."

¶70. While not under oath, in the video Dr. Hitt unequivocally declared that she wanted Sheron to receive everything under her will, and Charlotte and Yvonne to receive nothing. Hudson brought up the week long cooling-off period, and explained to her he thought the will could "be attacked." "Do you fully understand what you're doing and why you're doing it?" the lawyer asked. "Yes," she responds.

¶71. Critically, the lawyer asked her, "Has anyone, particularly Sheron, influenced you or coerced you or pressured you in any way to do this?" Dr. Hitt responded adamantly: "No."

29

She explained she was cutting her other daughters out of the will "because I want some peace and tranquility in how many years I have remaining." When asked if she understood the "other daughters" would take nothing from her estate, Dr. Hitt responded with intensity "*they already had it.*" She continued, "With the cost of - - the lawsuit that I - - they are the ones who initiated this, it was unnecessary, and it never needed to happen. So as far as I am concerned, the money I have had to spend because they initiated it, that *is* their inheritance."

¶72. "This is my will and what I want done," Dr. Hitt says, as clear as day.

> ***The trial court finds the mother intended to cut the other daughters out of her will.***

¶73. In its Opinion, the trial court ruled that it "found Hudson's testimony to be truthful and accurate." Moreover, the lawyer had recounted a familiar situation to the trial court: "The Court notes that a testator changing her will to disinherit her child(ren) because she is angry and/or disappointed in her child(ren), is not only legal, but also unfortunately very common."

¶74. The trial court also found "that Hudson rendered meaningful independent counsel" to Dr. Hitt, as shown by him building in the "cooling off" period. Crucially, and as a matter of fact, the trial court held that "There was no credible proof presented that indicated that Hudson prepared the 2015 [will] at the direction of Sheron."

¶75. As to what began this whole dispute, the trial court found that between "Hudson's testimony, the video [of Dr. Hitt] and Dr. Wilding's deposition when considered together clearly established that" on the day she signed the 2015 will, Dr. Hitt "was still angry about the conservatorship initially filed by Charlotte . . . as well as the attorney fees she had to pay

on their behalf." "She blamed all of them," the trial court found, for the "conservatorship and losing control over the majority of her money that she had worked hard for" during her life.

¶76. Critically, the trial court found "Hudson's testimony, as well as the video, clearly established that [Dr. Hitt] knowingly and purposefully disinherited all of her children and stepchildren, with the exception of Sheron, because she was upset that she no longer had control over 'all' of her money and/or property." Furthermore, the trial court found that Dr. Hitt "stated that Charlotte and the others received their portion when her monies has been used to pay for Charlotte's conservatorship attorney."

¶77. It bears emphasizing that the trial court made a finding of fact that "there was no credible proof presented that indicated that Hudson prepared the 2015 [will] at the direction of Sheron." Despite this finding, despite the credibility of the lawyer and the treating physician, and despite the fact that Dr. Hitt was still angry at her other daughters for taking her money and forcing the conservatorship—the trial court refused to admit the 2015 will to probate.

### *The proof doesn't support the ruling.*

¶78. On appeal, Sheron argued "the only basis" for finding there was undue influence was for the trial court "to accept the uncorroborated and unsupported allegations of Martha Bradberry to the exclusion of all competent evidence from legal and medical professionals." I agree. The decision of the trial court ignored the removal of the $160,000 by Charlotte, the fury Dr. Hitt felt at what she perceived as a betrayal, that her doctor said she was competent,

31

and her lawyer testifying said she was "absolutely" in charge. These findings are not arguments of counsel, but were made by the trial court itself.

¶79. The well-established rule is that "a chancellor may only be overturned where his judgment was manifestly wrong or there was not enough substantial, credible evidence to support his conclusions." *In re Est. of Taylor*, 755 So. 2d 1284, 1287 (¶11) (Miss. Ct. App. 2000). It seems the trial court disregarded its own findings of fact and its own credibility findings regarding the witnesses—and made a leap into a legal holding unsupported by the proof. The trial court seemingly disregarded the very testimony it had found credible—all of which centered on Dr. Hitt's anger at Charlotte and the "other daughters" for what she saw as the theft of her life savings and humiliating her into a conservatorship (and having to pay for that humiliation via attorney's fees).

¶80. The uncontested testimony of the lawyer who prepared the 2015 will, Dr. Hitt's treating physician, and critically, the matriarch herself, established that the will was not the product of undue influence. For this reason, I must respectfully dissent, as I would find the trial court did not have "enough substantial, credible evidence to support his conclusions." In the end, the conclusion does not match the proof. I would instead reverse and render and admit the 2015 will to probate.

   **GREENLEE, J., JOINS THIS OPINION.**